**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

MARGARET LYNN HARTSELL,
Plaintiff-Appellant,

v.

DUPLEX PRODUCTS, INCORPORATED;
RICK GREBNER; JOHN HARRIS; DENNIS
HARDIN,
Defendants-Appellees.

No. 97-1114

Appeal from the United States District Court
for the Western District of North Carolina, at Charlotte.
Graham C. Mullen, District Judge.
(CA-93-414-3-MU)

Argued: July 8, 1997

Decided: August 25, 1997

Before WILKINSON, Chief Judge, and WILKINS and
WILLIAMS, Circuit Judges.

_____

Affirmed by published opinion. Judge Williams wrote the opinion, in
which Chief Judge Wilkinson and Judge Wilkins joined.

_____

**COUNSEL**

**ARGUED:** Kevin Van Parsons, BLAKENEY & ALEXANDER,
Charlotte, North Carolina, for Appellant. Mark P. Henriques, WOM-
BLE, CARLYLE, SANDRIDGE & RICE, P.L.L.C., Charlotte, North
Carolina, for Appellees. **ON BRIEF:** David L. Terry, BLAKENEY

& ALEXANDER, Charlotte, North Carolina, for Appellant. Jim D. Cooley, WOMBLE, CARLYLE, SANDRIDGE & RICE, P.L.L.C., Charlotte, North Carolina, for Appellees.

_____

## OPINION

WILLIAMS, Circuit Judge:

Margaret Lynn Hartsell appeals from the grant of summary judgment against her claim under Title VII for sexual harassment, see 42 U.S.C.A. § 2000e-1 to -17 (West 1994 & Supp. 1997), and her claims under North Carolina law for intentional infliction of emotional distress and for negligent retention or supervision. She also appeals from the jury verdict against her claim under Title VII for retaliatory discharge, in which the jury found that Hartsell voluntarily quit her job and therefore could not recover. She claims that she was continuously harassed during her three-month tenure as an employee of Duplex Products, Inc., particularly at the hands of Rick Grebner, John Harris, and Dennis Hardin (together with Duplex, Defendants).[1] On appeal, Hartsell claims that the district court's partial grant of summary judgment was improper because she presented sufficient evidence to create a genuine issue of material fact on her sexual harassment claim and her two state-law claims. She further claims that the jury verdict should be set aside because the district court erred in failing to charge the jury that former employees are protected by Title VII, see Robinson v. Shell Oil Co., 117 S. Ct. 843 (1997), and in failing to charge the jury that even if Hartsell voluntarily quit her job, she nevertheless might have remained an "employee" at the time of the alleged retaliation. Finding no error, we affirm.

I.

Hartsell was employed by Duplex as a sales assistant in its Char-

_____

[1] Only Duplex and Grebner are defendants on the claim for negligent retention or supervision, and only Duplex is a defendant on the retaliatory discharge claim. Nevertheless, for ease of reference we use the term "Defendants" to include Duplex, Grebner, Harris, and Hardin.

lotte, North Carolina, office from September 23, 1992, until mid-December, 1992. During Hartsell's tenure, the office personnel in Charlotte consisted of an area manager, Grebner; three male sales representatives, Harris, Hardin, and Greg Schneider; a female sales representative, Pam Myers; and two female sales assistants, Hartsell and her sister, Marie Wade. Hartsell was responsible for providing support to the four salespeople -- Myers, Hardin, Harris, and Schneider. Her primary responsibility, however, was to support Myers, the only female salesperson in the office. Hartsell claims that she was subjected to a pattern of harassing behavior during her short tenure with Duplex. Because the district court resolved much of Hartsell's claim at the summary judgment stage, we catalog the alleged instances of harassment and the supporting evidence in the light most favorable to Hartsell, the nonmoving party. See Yarnevic v. Brink's, Inc., 102 F.3d 753, 756 (4th Cir. 1996). We note, however, that there is little, if any, evidence that Hartsell's complaints were made contemporaneously to Duplex or to Grebner.

Within two weeks of the beginning of Hartsell's employment, Hardin told Hartsell, "We've made every female in this office cry like a baby. We will do the same to you. Just give us time. We will find your weakness." (J.A. at 397.) Harris was present when the comment was made; both he and Hardin laughed. Hartsell smiled in response, and retorted to Hardin and Harris "that they would never see [her] cry in this office." (J.A. at 398.)

The salespeople at Duplex referred to the sales assistants as "the little people." At one point, Hardin drew a chart indicating that Wade and Hartsell were "little people," but that Hardin and Myers were "important people playing in the big leagues." (J.A. at 94-96.) Hardin told Hartsell, in case she "didn't understand" (J.A. at 393), that she was "not in [the salespeople's] league" (J.A. at 115). He added, "Take a look at the organizational chart." (J.A. at 115.) Hartsell testified that she did not think that Hardin was joking, and that she was offended.

In addition, at one point, Schneider -- who is not a defendant in this action -- referred to former sales assistant Peggy Trapp as his "slave." Schneider told Hartsell that she too "would become the slave." (J.A. at 402.) Hartsell testified that this comment offended her.

3

She "made it clear [to Schneider] that [she] didn't respect what he had just said to [her]." (J.A. at 403.)

Hartsell further claims that Hardin, upon seeing in the company magazine a woman who "was rather buxom and was wearing a low-cut T-shirt," asked in Hartsell's presence, "[W]hy don't we have sales assistants that look like that[?]" (J.A. at 1063-64.) Grebner, who was also present, answered, "[Y]eah, really." (J.A. at 1064.) Hartsell testified that she and Wade, who was also present, were "embarrassed and infuriated" by the comment. (J.A. at 1064.) Nevertheless, she did not complain at the time.

Hartsell also claims that, on another occasion, Grebner asked Myers if after the birth of her child she would be a "mini-van driving mommy" or "be a salesperson and play with the big boys." (J.A. at 396.) Hartsell responded, from the background, that Myers could be both. In addition, the male salespeople referred to Myers' husband, a stay-at-home father, as Myers' "wife." Although neither of these comments were directed at Hartsell, she testified that she was offended and insulted by them.

Then, sometime in late November, Hartsell was working on a computer graphics program at her desk. Harris and Hardin, who wanted to play a golf game on her computer, began kicking and pushing Hartsell's chair. They told her that she did not know what she was doing. When Hartsell stood to answer the telephone, Harris took her seat and tried to exit the program that Hartsell was using. Hartsell protested, and Harris responded, "[W]hy don't you go home and fetch your husband's slippers like a good little wife, that's exactly what my wife is going to do for me." (J.A. at 419.) Hartsell then told Harris, who was single, "Good luck in finding someone who will marry you." (J.A. at 126.) Meanwhile, Grebner overheard the exchange and told Harris and Hardin to stop bothering Hartsell. Hartsell testified that she told Grebner "at that time that he didn't need to defend me to these boys, that they wouldn't make me get off of that computer that day." (J.A. at 420.) She added, "I don't care if they go home and play with themselves instead of golf, they won't force me off of this computer today!" (J.A. at 51.)

During this series of events, Hartsell never complained to Grebner about the conduct of her co-workers. In fact, on at least one occasion,

4

Grebner asked her whether she was encountering any difficulty with the office environment. Hartsell assured Grebner that she was doing well. Moreover, there is evidence in the record that the atmosphere at Duplex was relaxed and informal, and that Hartsell participated in the office banter. For example, Hartsell and Myers compiled a list of "dumb blonde" jokes. Similarly, Hartsell joked about her husband's bad habits and her co-workers' personal details. At one point, Hartsell boasted to Grebner that she "could drink him under the table anytime." (J.A. at 102-03.) On another occasion, Hartsell played a joke on Hardin by replacing his phone cord with a defective one. Moreover, Hartsell's husband testified that Hartsell never complained or seemed emotionally upset about her job during her tenure as a Duplex employee.

Events came to a head on December 9, 1992, when Myers -- the sole female salesperson, and not a defendant to this action -- asked Hartsell to screen all of her calls. Hartsell resisted, and Myers became "stern." The next day, Hartsell went into Myers' office to discuss the call screening. The two became angry with each other. Hartsell described the ensuing events: "At that point, I had papers in my hand and I just dropped them on her desk. And I said,`I quit this.' I walked out of her office. I called her an insecure b----, and she responded by calling me one also." (J.A. at 384.)[2] Hartsell then walked out of the office. Hardin heard Hartsell say that she quit. According to Hardin, "I got up out of my chair and I followed Lynn out the door, asking her what was wrong, don't do this, let's talk it over, let's work it out, what can we do. She wouldn't talk to me, she wouldn't look at me." (J.A. at 246.)

At 11:15 a.m. that day, Wade called Grebner, who was temporarily at Duplex's office in Columbia, South Carolina, to tell him that Hartsell had quit. Grebner then spoke to Myers. Myers told Grebner that

_____

[2] Elsewhere, Hartsell offers a slightly different retelling: "The stress was so great that I dropped the papers I was holding on her desk and said[,] `I quit.'" (J.A. at 59.) Unlike the parties, we find no substantive distinction between Hartsell's saying "I quit," and "I quit this." In any event, Hartsell removes all doubt from the issue by explaining, "I'm not sure whether I meant I quit this job or I quit trying -- they meant the same to me at this point." (J.A. at 59.)

Hartsell "tossed the papers she was holding on[Myers'] desk and said she was leaving." (J.A. at 302.) Myers added that"on [Hartsell's] way out, [Hartsell] told [Myers] that she didn't have to take this and everyone had warned her about what a b---- [Myers] was." (J.A. at 302.) Hartsell did not come to work the next day, but she did place a telephone call to Grebner, her supervisor. At his request, she came to the office to meet with him. During the two-hour meeting, Hartsell for the first time claimed that she had been harassed by Myers, Hardin, and Harris. Grebner acknowledged the problems and told Hartsell that he would look into them. Hartsell claims that she offered to resign, but that Grebner, at that time, refused her resignation. She also told Grebner that she wanted to file harassment charges against the salespeople who allegedly harassed her. Grebner discouraged her from doing so. That afternoon, Grebner met with the salespeople and discussed Hartsell's claims. During the meeting, Grebner said,"I see a supportable case of relentless sexual harassment, not sex, but directed at women." (J.A. at 632.) Grebner later explained that he did not "necessarily" believe that there was such a supportable case, but that he "was shaking the tree." (J.A. at 269.)

On Saturday, December 12, 1992, Myers visited Grebner at home. Myers told Grebner that she thought Hartsell should not come back to Duplex. According to Myers, "I felt like [Hartsell] had grown beyond the job and would not be happy; that she was pursuing some other graphics interests and may not stay on a long-term basis anyway." (J.A. at 219.)

Then, on Sunday, December 13, 1992, Hartsell called Grebner at home. Grebner told her that she should not return to work, "that he felt that [Hartsell] had some personal issues that [she] needed to work out, [and] that he felt that because [she] would be working with Pam Myers so closely, [they] would have trouble in the future working together." (J.A. at 1093.) Hartsell said that she was not quitting. That night, Grebner called her back and told her that he was "accepting [her] resignation." (J.A. at 1095.)

On Monday, December 14, Hartsell came to work anyway, and began opening the mail. Grebner became angry and asked her what she was doing at work. Hartsell responded, "I have never resigned from Duplex Products and you never terminated me from Duplex

6

Products, so I am here showing up at work as scheduled." (J.A. at 1099.) Grebner told her to get out of the office. She did so.

That same day, Grebner filled out a termination form indicating that Hartsell's employment had ended because she was dissatisfied. The termination form indicated that Hartsell had "walked off the job saying she quit." (J.A. at 664.) The form further indicated that Hartsell "was doing very good work but had the feeling she was being harassed by at least three people in the office[. She] requested her job back, and I said no." (J.A. at 664.) Finally, although the performance rating assigned to Hartsell on the form indicated that she was eligible for rehire, Grebner specifically noted that he would not rehire her because she was "too unstable." Later, the form was altered -- the term "harassed" was changed to read "put upon," and the words "at least three" were eliminated.

On December 22, 1993, Hartsell filed suit against Duplex in the United States District Court for the Western District of North Carolina. She also named as individual defendants Grebner, Harris, and Hardin. She advanced claims under Title VII for sexual harassment and for retaliatory discharge, as well as claims under North Carolina state law for intentional infliction of emotional distress and negligent retention or supervision.

In an order dated September 5, 1995, the district court granted summary judgment against Hartsell on all claims except for her Title VII retaliation claim. The Title VII retaliation claim was tried before a jury during the week of September 3, 1996. On September 6, 1996, the jury returned a verdict in favor of Duplex. Hartsell filed a motion for a new trial on November 12, 1996, which the court denied. Hartsell filed a timely notice of appeal on January 14, 1997.

On appeal, Hartsell challenges the district court's partial grant of summary judgment and its instructions to the jury at trial. She argues that the district court erred in concluding that the harassment she suffered was insufficiently severe and pervasive to make out a sexual harassment claim under Title VII or to sustain a state-law cause of action for intentional infliction of emotional distress. She further argues that Robinson v. Shell Oil Co., 117 S. Ct. 843, 849 (1997), which held that post-employment discrimination is actionable under

7

Title VII, renders the district court's jury charge erroneous. Finally, she claims that even under pre-Robinson law, the district court erred by failing to instruct the jury that Hartsell may have remained an "employee" for purposes of Title VII after she voluntarily quit. We consider these arguments in turn.

II.

Hartsell first argues that the district court erred in granting summary judgment against her on her Title VII claim for sexual harassment, her state-law claim for intentional infliction of emotional distress, and her state-law claim for negligent retention or supervision. Defendants argue at some length that Hartsell cannot make this argument because her notice of appeal did not specifically refer to the order granting summary judgment. (Appellee's Br. at 1-5.) Instead, Hartsell's notice of appeal specified only "the Final Judgment and Order denying Plaintiff's Motion for a New Trial and Judgment Notwithstanding the Verdict entered in this action on October 29, 1996 and December 16, 1996." (J.A. at 1596.) Rule 3(c) of the Federal Rules of Appellate Procedure requires that "[a] notice of appeal . . . must designate the judgment, order, or part thereof appealed from, and must name the court to which the appeal is taken." Fed. R. App. P. 3(c). Because Rule 3 is jurisdictional, see Smith v. Barry, 502 U.S. 244, 248 (1992), Defendants argue that we are without jurisdiction to hear Hartsell's appeal from the partial grant of summary judgment filed on September 5, 1995.

We disagree with Defendants' argument. We have held "that an error in designating the issue appealed will not result in a loss of appeal as long as the intent to appeal a specific judgment can be fairly inferred and the appellee is not prejudiced by the mistake." Canady v. Crestar Mortgage Corp., 109 F.3d 969, 974 (4th Cir. 1997) (quotation omitted). We further explained that the question is to be answered by determining whether the appellee had notice of the appeal and an opportunity fully to brief the issue. Id. Here, both criteria are satisfied. Defendants were given adequate notice of the nature of Hartsell's appeal by her brief, which Canady recognizes as sufficient. Id. (agreeing with "[c]ourts [that] have held that when the appellant addresses the merits of a particular issue in her opening brief, this is enough to demonstrate that the appellee had notice of the

8

issue and did not suffer prejudice" (quotation omitted)). Moreover, Defendants fully responded in their brief to Hartsell's appeal from the summary judgment order and make no other claim of prejudice. Therefore, we have jurisdiction under 28 U.S.C.A.§ 1291 (West 1993), to consider Hartsell's appeal from the order granting summary judgment.

We review the grant of summary judgment de novo, using the same standards as applied by the district court. Roe v. Doe, 28 F.3d 404, 406 (4th Cir. 1994). We next consider each of the three claims resolved on summary judgment -- for sexual harassment,[3] for intentional infliction of emotional distress, and for negligent retention or supervision.

A.

Title VII makes it an "unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge . . . or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's sex." 42 U.S.C.A. § 2000e-2(a)(1) (West 1994). Because the workplace environment is one of the "terms, conditions, or privileges of employment," see Meritor Savs. Bank v. Vinson, 477 U.S. 57, 64-67 (1986), Title VII creates a cause of action in favor of persons forced to work in a hostile workplace, see id. at 66 (establishing "that a plaintiff may establish a violation of Title VII by proving that discrimination based on sex has created a hostile or abusive work envi-

_____

[3] We have made clear that

> [t]wo forms of workplace sexual harassment have been held to constitute discrimination "because of" one's sex, hence to offend [Title VII]: (1) quid pro quo harassment, in which an employer requires sexual favors of an employee in exchange for the benefits of employment, and (2) sexually-oriented harassment by one's fellow-employees sufficiently egregious to create a "hostile workplace environment" that is knowingly tolerated by the employer.

McWilliams v. Fairfax County Bd. of Supervisors, 72 F.3d 1191, 1195 (4th Cir.), cert. denied, 117 S. Ct. 72 (1996). Hartsell's claim is exclusively of the second category.

9

ronment"). To make out a hostile work environment claim, the claimant "must prove: (1) that [s]he was harassed `because of' [her] `sex;' (2) that the harassment was unwelcome; (3) that the harassment was sufficiently severe or pervasive to create an abusive working environment; and (4) that some basis exists for imputing liability to the employer." Wrightson v. Pizza Hut of America, Inc., 99 F.3d 138, 142 (4th Cir. 1996); see also Swentek v. USAir, Inc., 830 F.2d 552, 557 (4th Cir. 1987). Here, the district court concluded persuasively that Hartsell failed the third element because "the conduct Hartsell complains of consists of no more than mildly offensive (and unactionable) utterances." (J.A. at 699-700.) We agree.

First, several of the allegedly offensive comments catalogued by Hartsell are not even related to her gender. For example, the description of Hartsell and Wade as "the little people," as well as the reference to Trapp as a "slave,"[4] are dependent on status within the workplace rather than gender. We have made clear that only harassment that occurs because of the victim's gender is actionable. See Wrightson, 99 F.3d at 142 (noting that Title VII prohibits employers from discriminating against employees "on the basis of the latter's `sex,' or gender"); Hopkins v. Baltimore Gas & Elec. Co., 77 F.3d 745, 751 (4th Cir.) (explaining "that in prohibiting sex discrimination solely on the basis of whether the employee is a man or a woman, Title VII does not reach discrimination based on other reasons, such as the employee's sexual behavior, prudery, or vulnerability"), cert. denied, 117 S. Ct. 70 (1996); McWilliams v. Fairfax County Bd. of Supervisors, 72 F.3d 1191, 1196 (4th Cir.) (refusing to recognize a Title VII hostile work environment claim for discrimination "`because of' [the harasser's] vulgarity and insensitivity and meanness of spirit"), cert. denied, 117 S. Ct. 72 (1996). We have further explained that "[a]n employee is harassed or otherwise discriminated against `because of' his or her sex if, `but-for' the employee's sex, he or she would not have been the victim of the discrimination." Wrightson, 99

_____

**4** Schneider is not a defendant to this action, and there is no evidence that Hartsell ever complained to Grebner or to Duplex about Schneider's behavior. Therefore, his behavior is likely not properly before us. We need not address this question, however, for even if Schneider's statement were in issue, it was clearly not made "because of" Hartsell's gender.

10

F.3d at 142. Hartsell simply cannot show that "but for" her gender, she would not have been described as one of the"little people" or as a "slave." Rather, these comments depended on her status in the workplace. An insulting or demeaning remark does not create a federal cause of action for sexual harassment merely because the "victim" of the remark happens to belong to a class protected by Title VII.

Second, the remaining allegations fail, as a matter of law, at the third step. The events catalogued by Hartsell, even assuming them all to be true, are simply insufficient to satisfy the requirement "that the harassment was sufficiently severe or pervasive to create an abusive working environment." Id. On the contrary, Hartsell's allegations demonstrate only that the salespeople were unpleasant and sometimes cruel. We explained in Hopkins that

> [n]ot all sexual harassment that is directed at an individual because of his or her sex is actionable. Title VII does not attempt "to purge the workplace of vulgarity." Baskerville v. Culligan Int'l Co., 50 F.3d 428, 430 (7th Cir. 1995). As the Supreme Court recognized in Harris v. Forklift Sys., Inc., 114 S. Ct. 367, 370 (1993), "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment -- an environment that a reasonable person would find hostile or abusive -- is beyond Title VII's purview." See also Meritor, 477 U.S. at 67 (recognizing that conduct amounts to actionable sexual harassment only when it is "sufficiently severe or pervasive `to alter the conditions of [the victim's] employment and create an abusive working environment'" (alteration in original) (citation omitted)).

77 F.3d at 752 (parallel citations omitted). We therefore concluded in that case that the conduct at issue failed to amount to a violation of Title VII. "While we do not approve of [the employer's] apparent willingness to offend and provoke employees with his ambiguously sexual innuendos, Title VII was not designed to create a federal remedy for all offensive language and conduct in the workplace." Id. at 754; see also Baskerville v. Culligan Int'l Co. , 50 F.3d 428, 430 (7th Cir. 1995) ("The concept of sexual harassment is designed to protect working women from the kind of male attentions that can make the

11

workplace hellish for women . . . . It is not designed to purge the workplace of vulgarity.").

The only alleged instances of harassment logically attributable to Hartsell's gender are Hardin's statement, "We've made every female in this office cry like a baby"; Hardin's comment upon seeing a buxom woman in the company magazine; Grebner's question to Myers as to whether she would be a "mini van driving mommy" or "be a salesperson and play with the big boys"; **5** and Harris's statement that Hartsell should "go home and fetch [her] husband's slippers like a good little wife." There is no allegation that Hartsell was inappropriately touched, propositioned, flirted with, taunted, or even ogled. See Baskerville, 50 F.3d at 431 ("[Defendant] never touched the plaintiff. He did not invite her, explicitly or by implication, to have sex with him, or to go out on a date with him. He made no threats. He did not expose himself, or show her dirty pictures."). None of the alleged comments were even vulgar, much less obscene. In fact, the only vulgarities documented in the record -- a reference to masturbation and profane name-calling -- were uttered by Hartsell herself. Under these circumstances, allowing Hartsell's claim to go to trial would countenance a federal cause of action for mere unpleasantness. Title VII is not a federal guarantee of refinement and sophistication in the workplace -- in this context, it prohibits only harassing behavior that is so severe or pervasive as to render the workplace objectively hostile or abusive. See Hopkins, 77 F.3d at 753 (citing Harris v. Forklift Sys., Inc., 114 S. Ct. 367, 370 (1993)). The behavior here falls well short of that mark.

Hartsell's only remaining objection to the grant of summary judgment against her hostile work environment claim is that, in the Fourth Circuit, the question of whether "harassment was sufficiently severe or pervasive is quintessentially a question of fact." Paroline v. Unisys

_____

**5** We need not decide whether Grebner's statement, which was not directed at Hartsell, is cognizable in this action because even if Hartsell were permitted to maintain an action for an insulting comment directed at a co-worker, Grebner's comment clearly fails at the third step of the test. Hartsell simply cannot prove "that the harassment was sufficiently severe or pervasive to create a hostile working environment." Wrightson v. Pizza Hut of America, Inc., 99 F.3d 138, 142 (4th Cir. 1996).

12

Corp., 879 F.2d 100, 105 (4th Cir. 1989), vacated in part on other grounds, 900 F.2d 27 (4th Cir, 1990) (en banc). But the claims propounded by Hartsell -- even assuming them all to be true -- are so trivial, so isolated, and so far from the paradigmatic case of sexual harassment, that summary judgment was clearly appropriate. Hartsell has produced evidence that the salespeople at Duplex-- one of whom was female -- were at times difficult to work with, insensitive, immature, and even insulting. Even assuming the truth of this evidence, and viewing the inferences therefrom in the light most favorable to Hartsell, she is not entitled to try her case.**6** Title VII does not guarantee a happy workplace, only one free from unlawful discrimination. Accordingly, we affirm the district court's grant of summary judgment against Hartsell on her hostile work environment claim.**7**

B.

Hartsell next argues that the district court erred in granting summary judgment against her claim under North Carolina law for intentional infliction of emotional distress. The district court reasoned that,

_____

**6** Hartsell's theory would preclude the entry of summary judgment in any sexual harassment case. Here, there are no questions of fact -- we reject her claim despite our assumption that her allegations are true.
**7** We hasten to add that Hartsell's Title VII claim may be flawed in other respects, which were not addressed by the district court, as well. First, because Hartsell never complained to her husband or to the alleged harassers until after her confrontation with Myers, she cannot prove "that the harassment was unwelcome." Wrightson v. Pizza Hut of America, Inc., 99 F.3d 138, 142 (4th Cir. 1996). To the contrary, the record clearly suggests that Hartsell fully participated in, and even enjoyed, the office banter until her run-in with Myers. She cannot now cry "foul" for conduct that was, at the time, not "unwelcome." Second, because Hartsell never notified her employer or followed the internal grievance procedure, she cannot prove "that some basis exists for imputing liability to the employer." Id.; see also Andrade v. Mayfair Management, Inc., 88 F.3d 258, 261 (4th Cir. 1996) (explaining that an employer is liable for impermissibly harassing behavior only if it had actual or constructive knowledge of the illegal conduct and took no prompt, adequate remedial action). Because the district court granted summary judgment on the basis that the conduct was insufficiently severe or pervasive, we affirm on that ground without relying on these other bases.

13

because "the conduct Hartsell complains of is[at most] inconsiderate and insulting" (J.A. at 704), the conduct was insufficiently extreme and outrageous to sustain a cause of action for intentional infliction of emotional distress. We agree.

Under North Carolina law, a plaintiff alleging intentional infliction of emotional distress must prove "(1) extreme and outrageous conduct, (2) which is intended to cause and does cause (3) severe emotional distress." Hogan v. Forsyth Country Club Co., 340 S.E.2d 116, 119 (N.C. 1986). The conduct at issue falls far short of that required to make out a claim for intentional infliction of emotional distress. Moreover, we have held that "when the district court has already determined . . . that the conduct complained of, in a full contextual analysis, was not sufficiently egregious to create an `abusive' or `hostile' environment," then we cannot sustain a state-law cause of action for intentional infliction of emotional distress. See Dwyer v. Smith, 867 F.2d 184, 194,95 (4th Cir. 1989) (applying Virginia law). Accordingly, we affirm, on the reasoning of the district court, the order granting summary judgment against Hartsell on her claim for intentional infliction of emotional distress.

C.

Hartsell next argues that the district court erred in granting summary judgment against her on her claim under North Carolina law for negligent supervision or retention. North Carolina law requires, as "[a]n essential element of a claim for negligent retention," that an employee of the employer "committed a tortious act resulting in plaintiffs' injuries." Waddle v. Sparks, 414 S.E.2d 22, 29 (N.C. 1992). In other words, North Carolina courts will not hold an employer vicariously liable unless an employee has committed a cognizable wrong against the plaintiff. Recognizing this fact, the district court held that "[s]ince Hartsell cannot establish the first element of negligent retention and supervision [i.e., that there be an underlying tort], summary judgment must be granted in Duplex's and Grebner's favor for her claims based on this tort." (J.A. at 705-06.) On appeal, Hartsell argues that a violation of Title VII satisfies the underlying tort requirement. Because we find neither an underlying tort nor a violation of Title VII, we need not address the question. Accordingly, we affirm, on the reasoning of the district court, the grant of summary

14

judgment against Hartsell on her claim for negligent supervision or retention.

III.

Hartsell also claims that the district court erred by failing to instruct the jury that post-employment retaliation is actionable under Robinson v. Shell Oil Co., 117 S. Ct. 843, 849 (1997). At the time of the trial, the controlling Fourth Circuit authority was Robinson v. Shell Oil Co., 70 F.3d 325 (4th Cir. 1995) (en banc), rev'd, 117 S. Ct. 843, in which this court held "that the meaning of the term `employees' in Title VII's anti-retaliation provision does not include former employees," id. at 330. Since the trial, however, the Supreme Court has recognized that Title VII prohibits employers from retaliating against former employees, as well as current employees, for engaging in rights protected by Title VII. Robinson, 117 S. Ct. at 849, rev'g 70 F.3d 325. Accordingly, Hartsell argues that the district court necessarily erred by instructing the jury under the former Fourth Circuit rule.

The district court instructed the jury that "[i]n order for the plaintiff to prevail in this action, she must prove . . . that she was involuntarily discharged." (J.A. at 986, 1520.) The district court also instructed the jury that "[t]o prevail in this case . . . the plaintiff must also prove that she . . . was involuntarily discharged by the defendant. If you find that the plaintiff voluntarily quit her job with Duplex, then you must return a verdict in favor of the defendant Duplex." (J.A. at 1520-21.) Thereafter, the jury, in a special verdict, expressly found that Hartsell was not involuntarily discharged by Duplex, thereby also necessarily finding by implication that Hartsell voluntarily quit. (J.A. at 1543.) According to Hartsell, the district court's "instruction totally precluded any possibility that the jury could find[that] Ms. Hartsell suffered post-employment retaliation." (Appellant's Br. at 24.)

We must determine whether the district court's instructions, construed as a whole, properly informed the jury of the controlling legal principles without misleading or confusing the jury to Hartsell's prejudice. See Spell v. McDaniel, 824 F.2d 1380, 1395 (4th Cir. 1987). "A judgment will be reversed for error in jury instructions `only if the error is determined to have been prejudicial, based on a review of the record as a whole.'" Sturges v. Matthews, 53 F.3d 659, 661 (4th Cir.

15

1995) (quoting <u>Wellington v. Daniels</u>, 717 F.2d 932, 938 (4th Cir. 1983)). Under this standard, we reject Hartsell's attack on the jury charge. The district court simply did not invoke the former Fourth Circuit rule. Instead, it instructed the jury that there had to be some adverse employment action taken against Hartsell for her to maintain an action for retaliatory discharge. This is a correct statement of current law. <u>See, e.g.</u>, <u>Hopkins v. Baltimore Gas & Elec. Co.</u>, 77 F.3d 745, 754 (4th Cir.), <u>cert. denied</u>, 117 S. Ct. 70 (1996). Moreover, the district court's charge was consistent with Fourth Circuit law that when an employee voluntarily quits under circumstances insufficient to amount to a constructive discharge, there has been no "adverse employment action." <u>See Shealy v. Winston</u>, 929 F.2d 1009, 1012-13 (4th Cir. 1991); <u>see also Evans v. Davie Truckers, Inc.</u>, 769 F.2d 1012, 1014 (4th Cir. 1985) (upholding a ruling that because the "evidence clearly established that [the employee] voluntarily resigned his employment with the defendant, [he] suffered no adverse employment action at the hand of the defendant" (internal quotation marks omitted)). Therefore, the district court's charge did not even implicate <u>Robinson</u>.**8**

Moreover, to the extent that Hartsell now seeks to advance a "failure to rehire" argument, we reject this argument as a matter of law. Hartsell failed to report to work, refused to follow orders, called her immediate supervisor an "insecure b----," and experienced continuing difficulty with co-workers. Moreover, the termination form completed by Grebner indicated that he would not rehire Hartsell because she was "too unstable." It seems hardly remarkable that an employer would "refuse to rehire" an employee who declined to perform a required task, insulted an immediate supervisor in profane terms, and

_____

**8** The weakness of Hartsell's argument is underscored by the fact that even before <u>Robinson</u>, Title VII prevented discrimination against job applicants. <u>See, e.g.</u>, <u>Robinson v. Shell Oil Co.</u>, 70 F.3d 325, 330 (4th Cir. 1995) (en banc) (noting that Title VII applies to job applicants), <u>rev'd on other grounds</u>, 117 S. Ct. 843 (1997). Had Hartsell wanted to claim that Duplex took "adverse employment action" against her by refusing to rehire her after she voluntarily quit, she could have done so. Instead, Hartsell chose to characterize the event as though she had been involuntarily terminated. She lost that gambit and now seeks to reverse course.

16

walked out of the office in the middle of the work day. Therefore, even if Duplex did "fail to rehire" Hartsell-- a version of events that is not supported by the record -- it did so for valid, nondiscriminatory reasons. The district court's jury charge therefore was not erroneous, and we affirm the resulting jury verdict.

IV.

In her final argument, Hartsell claims that the jury charge was defective even under pre-Robinson law. She claims that the jury's determination that she voluntarily quit (which she necessarily relies on in making her first challenge to the jury instruction) was erroneous because the district court did not instruct the jury that she could have remained an "employee" even after she quit on Friday, December 11:

> The jury was never instructed to consider the intention of Duplex in determining when Ms. Hartsell's employment ended. If it had been so instructed, it surely would have considered the following evidence. Grebner testified that saying, "I quit, I can't take this anymore" was not an irrevocable thing. Grebner also met with Ms. Hartsell on Friday as though she were an employee. Ms. Hartsell testified Grebner left the decision about whether she would return to work with her. Additionally, both the original, and the altered golden rods [termination explanations] indicated Ms. Hartsell was paid through December 15, 1992, (which is also indicated as the day of termination) and one of them indicated she was discharged for cause on that day. . . . Since the jury was not instructed to consider such factors as the time during which Ms. Hartsell was paid, and other circumstances concerning the intention of the parties, it could not have made the finding necessary under Title VII; that is, whether she was an employee at the time of the retaliation.

(Appellant's Br. at 31-32.) According to Hartsell, this evidence was critical because "the issue under Title VII was not how Ms. Hartsell was terminated (i.e. whether or not she was involuntarily terminated) but rather whether she was an employee at the time of the retaliation." (Appellant's Br. at 30.)

17

We will "reverse a jury instruction error only if it [was] prejudicial, based on a review of the record as a whole." <u>Ross v. Saint Augustine's College</u>, 103 F.3d 338, 344 (4th Cir. 1996). [9] Under this standard, Hartsell's challenge to the adequacy of the jury charge fails. The jury considered all the evidence described above, and nevertheless concluded that Hartsell voluntarily quit her job at Duplex. Accordingly, we reject Hartsell's second challenge to the jury verdict.

V.

In short, we affirm the grant of summary judgment against Hartsell on her claims for sexual harassment, for intentional infliction of emotional distress, and for negligent supervision or retention. We also conclude that the district court did not err in instructing the jury. Accordingly, the jury verdict was not flawed. The final order of the district court is therefore affirmed in all respects.

<u>AFFIRMED</u>

_____
[9] Duplex claims that Hartsell did not object to the proposed charge on the stated grounds. If Hartsell did not object, we would apply an even more stringent standard of review. <u>See</u> Fed. R. Civ. P. 51; <u>Spell v. McDaniel</u>, 824 F.2d 1380, 1398-99 (4th Cir. 1987). Because we reject Hartsell's challenge under even the more relaxed standard, it is not necessary to determine whether she properly objected to the charge.