Scott **BRADLEY**, Plaintiff,

v.

**CMI INDUSTRIES, INC.**, a Delaware Corporation, and Don Norton, Defendant.

No. CIV. 5:97–CV189–H.

United States District Court, W.D. North Carolina, Statesville Division.

July 27, 1998.

Christopher D. Lane, Kimberly P. Reaves, McElwee & McElwee, N. Wilkesboro, NC, for Plaintiff.

R. Lewis Alexander, Sr., Elkin, Thomas K. Barlow, Ronald James Tryon, Duff, Dubberly, Tuner, Tryon, White & Boykin, L.L.C., Columbia, SC, for Defendant.

### MEMORANDUM AND ORDER

HORN, Chief United States Magistrate Judge.

**THIS MATTER** is before the Court on "Defendant's Motion for Summary Judgment" (document # 9) and "Memorandum of Law in Support..." (document # 10), both filed June 8, 1998. "Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment" (document # 11) and "Plaintiff's Record Appendix" (document # 12) were filed on June 23, 1998, and Defendant's "Reply to Plaintiff's Memorandum ..." (document # 13) was filed on July 6, 1998. The parties have consented to Magistrate Judge jurisdiction under 28 U.S.C. § 636(c), and this matter is now ripe for disposition.

Having fully considered the Defendant's motion, the parties' arguments, the record, and the applicable authorities, the Court will *grant* Defendant's motion for summary judgment in its entirety.

### I. PROCEDURAL AND FACTUAL BACKGROUND

The Plaintiff, Scott Bradley was employed by Defendant CMI Industries ("CMI") from December 1992, through April 3, 1997. He worked his way from his initial hourly position as a "dropwire person" up through the ranks until he was promoted to Manager of Logistics and Warehousing in August, 1996. In this position, which he held until his termination, Plaintiff was responsible for over-

seeing the shipment and receipt of raw materials and finished goods and for coordinating the timely and efficient delivery of materials and supplies to the various manufacturing departments of CMI's textile operations in Elkin, North Carolina.

Plaintiff was directly supervised by Dennis Haynes, Director of Planning and Warehousing, and ultimately by Dan Norton, the Vice-President and General Manager of the Elkin facilities. Although Plaintiff's tenure as manager of logistics and warehousing had begun well, over time, Norton and Bradley, as well as CMI's Director of Human Resources, Gary Sebastian, had received numerous complaints that Plaintiff did not focus on getting materials to the departments as they were needed, but sought to control the shipping of materials according to his own schedule; that the heads of numerous departments considered him increasingly difficult to deal with; and that the departments under his supervision were consistently disorganized and poorly maintained, much to the detriment of employee morale, safety, and efficiency. In specific response to the complaints of poor housekeeping and appearance, Norton and Sebastian began conducting weekly inspections for organization and cleanliness, completing a report of all such inspections, and assigning a letter grade for each department to rate its progress.

On March 28, 1997, Haynes presented Plaintiff with a negative report, prepared by Sebastian, on housekeeping in his areas; Plaintiff disagreed with this report vehemently, wrote "I disagreed" (or words to that effect) across the bottom of the report, and requested a meeting with Norton to find out what he could do to improve. Haynes agreed to set up such a meeting, but testified that he thought Plaintiff was very upset and needed a "cooling off period," so he did not schedule the meeting until the next week.

On March 31, 1997, the following Monday, Haynes met with Sebastian and Norton over lunch, at which time they discussed Plaintiff's hostility to criticism, his change from a "service oriented style" to a "demanding type management style," whether he was "salvageable," and whether he could be molded into a team player.

Meanwhile, later that day, Plaintiff was eating lunch at a restaurant in Elkin when he noticed a CMI truck parked at another restaurant across the street. He went into the other restaurant, where he found a CMI driver, Tommy Combs, eating alone. Plaintiff requested that Combs report to his office upon his return to the plant. Combs complied, and Plaintiff at that time informed him that it was against company policy to park company trucks at local restaurants and that Norton would probably have fired him had he been the one to discover the parking of the truck. Since he did not recall being informed of this policy, and since Norton had seen him previously parked at the same restaurant, Combs became very confused and upset, fearing that his job was in jeopardy for violating a rule he did not know about. He brooded over this reprimand for the rest of the day, and discussed it with his wife, Janice (also a CMI employee) that evening after work.

The next day, April 1, 1997, Plaintiff noticed that Combs seemed to be upset; he notified Combs' direct supervisor, Jim Bradley (no relation to Plaintiff) and the two had a meeting with Combs. Plaintiff asked Combs "what his problem was with the way I told him or how he felt about what I told him, was he still upset about what I told him...." Combs indicated that he was still upset about the warning he had received; shortly thereafter, he stated that he thought Don Norton had previously acted inappropriately towards his wife, Janice, by putting his arm around her at work and he "felt like whipping that son of a bitch's ass." According to Plaintiff, Combs then told Plaintiff and Bradley that "When he comes into my wife's office, he walks around and talks with everybody about everything except for work and puts his hand on her shoulder." Combs did not indicate that he had ever himself seen this conduct occur, but indicated his belief that "I think that man is after my wife."

Plaintiff testified that he was "floored" by this accusation; that "that would have been the last thing I would have expected of [sic] anybody to say;" that he had never himself seen Norton and Janice interacting at work; and that he relayed Combs' statements to

Haynes, who responded "you've got to be kidding" and said that he would mention it to Sebastian. Sebastian testified that, based on his experience and his familarity with Combs' "vocal and excitable" nature, he considered the accusations a "non-occurrence," and therefore did not do anything else or tell anyone else about them.

The following day, April 2, 1997, Haynes told Plaintiff that Norton would meet with him that afternoon to discuss the housekeeping issues, as well as what he expected of Plaintiff as a shipping manager. Before the meeting began, Haynes and Sebastian, who also attended, suggested to Plaintiff that he quietly listen to Norton and that he would have an opportunity to respond at the end. Norton began by addressing the complaints about Plaintiff from managers of other departments, although Plaintiff contends that no specific managers or complaints were identified; instead of listening, however, Plaintiff began discussing his housekeeping grade from the previous Friday and offering his own suggestions on how the other departments should be run. Norton and Sebastian testified that they concluded from Plaintiff's demeanor and criticism that he was interested only in his own agenda, and did not buy into their concept of team management. At no time during this meeting were Tommy Combs' accusations regarding Norton's behavior mentioned or discussed by anyone.

Later that afternoon, Norton, Sebastian, and Haynes met with another manager, Michael Ambler, to assess Bradley's future with CMI. Haynes and Ambler, when asked, told Sebastian that they could not use Plaintiff in their departments in a different capacity. Norton called for a vote on whether Plaintiff should be retained or fired, and the other three men each voted for termination. Immediately thereafter, Norton and Sebastian called the Vice–President of Human resources, Mike Hopp, to describe the situation and formalize Plaintiff's discharge. The next day, Plaintiff was informed of his termination. In a notice of separation dated April 7, 1997, Haynes wrote that Plaintiff was discharged because he "disagreed with senior management direction and philosophy" and that he had a work record of "good" production and attendance, but only "fair" cooperation.

Neither Plaintiff nor anyone else employed by CMI ever confronted Norton, contacted the Equal Employment Opportunity Commission ("EEOC"), or took any other disciplinary or remedial action regarding Combs' accusations of Norton's alleged conduct towards Janice Combs. Sometime after Plaintiff was terminated, Tommy Combs recanted these allegations, indicating that he was just upset at the time and that although his wife and he had discussed Norton before, she had never accused him of improper behavior or inappropriate physical contact. Janice Combs herself has testified that Norton never made any sexual advances or suggestive remarks towards her, touched her inappropriately, or otherwise made her uncomfortable.

Plaintiff filed the instant action in the Superior Court of Wilkes County on June 11, 1997, alleging wrongful termination in violation of public policy; after filing a grievance with the EEOC regarding his own termination and receiving a right to sue letter, Plaintiff amended his complaint to allege a claim for retaliatory discharge under Title VII of the Civil Rights Act of 1964. Shortly thereafter, Defendants removed the action to this Court. The parties engaged in reciprocal discovery, ad Defendants filed their motion for summary judgment on June 8, 1998.

## II. DISCUSSION OF CLAIMS

Pursuant to Federal Rule of Civil Procedure 56(c), a summary judgment motion should be granted when the pleadings, responses to discovery, and the record reveal that "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." See also Charbonnages de France v. Smith, 597 F.2d 406 (4th Cir.1979). Once the movant has met its burden, the non-moving party must come forward with specific facts demonstrating a genuine issue for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party."

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). However, the party opposing summary judgment may not rest upon mere allegations or denials and, in any event, a "mere scintilla of evidence" is insufficient to overcome summary judgment. *Id.* at 249–50, 106 S.Ct. 2505.

When considering summary judgment motions, courts must view the facts and the inferences therefrom in the light most favorable to the party opposing the motion. *Id.* at 255, 106 S.Ct. 2505; *Miltier v. Beorn,* 896 F.2d 848 (4th Cir.1990); *Cole v. Cole,* 633 F.2d 1083 (4th Cir.1980). Indeed, summary judgment is only proper "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there [being] no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (internal quotations omitted).

Finally, as the Fourth Circuit has held, "[t]he fact that motive is often the critical issue in employment discrimination cases does not mean that summary judgment is never an appropriate vehicle for resolution." *Ballinger v. North Carolina Agric. Extension Serv.,* 815 F.2d 1001, 1004 (4th Cir.), *citing International Woodworkers of America v. Chesapeake Bay Plywood Corp.,* 659 F.2d 1259, 1272 (4th Cir.1981) If the dispute between the parties is not material or not genuine, summary judgment is appropriate.

### A. Plaintiff's Title VII Retaliatory Discharge Claim (Second Claim for Relief)

In addition to prohibiting harassment or discrimination in the workplace on the basis of sex, race, religion, or gender, Title VII of the Civil Rights Act of 1964 prohibits employers from retaliating against employees who enforce their rights under the Act. 42 U.S.C. § 2000e–3(a).[1] To establish a prima facie case of retaliatory discharge in violation of Title VII, an employee must show that: 1) the employee engaged in protected activity; 2) the employer took adverse employment action against the employee; and 3) a causal connection existed between the protected activity and the adverse action. *McNairn v. Sullivan,* 929 F.2d 974, 980 (4th Cir.1991), *citing Ross v. Communications Satellite Corp.,* 759 F.2d 355, 365 (4th Cir.1985), *abrogated in part on other grounds by Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989).

Once the Plaintiff has made the required prima facie showing, the burden shifts to the employer to produce a "legitimate nondiscriminatory reason for the adverse action, thereby rebutting the presumption of retaliation raised by the prima facie case." *Ross,* 759 F.2d at 365, *citing Womack v. Munson,* 619 F.2d 1292, 1296 (8th Cir.1980). Finally, if the employer satisfies this burden of production, "the employee bears the ultimate burden of proving retaliation by demonstrating that the employer's proffered reason is pretextual" and that the real motive for the employment action was retaliation. *Id., citing Womack,* 619 F.2d at 1296; *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 506–11, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).

It is undisputed that CMI took adverse employment action against Plaintiff by terminating him. *See Hartsell v. Duplex Products, Inc.,* 123 F.3d 766, 775 (4th Cir.1997) (noting that termination is an adverse employment action). Plaintiff's ability to establish a prima facie case therefore depends on 1) whether Plaintiff engaged in "protected activity" and, 2) if so, whether there was a causal link between his protected activity and his termination.

---

1. Title 42 U.S.C. § 2000e–3 specifically provides as follows:

   It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment, for an employment agency, or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs, to discriminate against any individual, or for a labor organization to discriminate against any member thereof or applicant for membership, because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

■ The pertinent language of Title VII characterizes two broad categories of activities as "protected" for the purposes of a retaliation claim; an employer may not retaliate against an employee for 1) participating in an ongoing investigation or proceeding under Title VII, or 2) opposing discriminatory practices in the workplace. 42 U.S.C.A. § 2000e–3(a); *Laughlin v. Metropolitan Washington Airports Authority*, 149 F.3d 253, 258 (4th Cir.1998). The statute specifically defines "participation" as (1) making a charge; (2) testifying; (3) assisting; or (4) participating in any manner *in an investigation, proceeding, or hearing under Title VII. Id.; see also Laughlin*, 149 F.3d 253, 258 (court's refusal to analyze retaliation claim under participation clause was proper where there was no ongoing "investigation, proceeding or hearing" at time employee was terminated for covertly copying documents relevant to an EEOC charge and suit filed later by another employee).

■ Since no one-including Janice Combs, the alleged object of Norton's attention-ever filed an internal grievance, EEOC charge, or lawsuit regarding Tommy Combs' allegations, there was no investigation for Plaintiff to have participated in, and therefore his actions "must be oppositional or [his] case fails as a matter of law." *Id.* "Opposition activity encompasses utilizing informal grievance procedures as well as staging informal protests and voicing one's opinions in order to bring attention to an employer's discriminatory activities." *Id., citing Armstrong v. Index Journal Co.*, 647 F.2d 441, 448 (4th Cir.1981). However, as one court has noted,

Informal activities outside Title VII's established procedure are not necessarily entitled to federal protection. "[W]here accusations are made outside the procedures set forth by Congress that accusation is made at the accuser's peril." *E.E.O.C. v. C & D Sportswear Corp.*, 398 F.Supp. 300, 306 (M.D.Ga.1975). While employees should be encouraged to work out problems without resorting to federal process, careless and uncounseled accusations of discrimination are not necessarily protected by Title VII's opposition clause. Congress established Title VII procedures for a reason, and complaints made outside that system necessarily carry some additional risk.

*Bray v. Tenax*, 905 F.Supp. 324, 328 (E.D.N.C.1995).

■ The court must employ a balancing test to determine whether opposition activity is protected under Title VII. *Armstrong*, 647 F.2d at 448, *citing Hochstadt v. Worcester Found. for Experimental Biology*, 545 F.2d 222, 231 (1st Cir.1976)). Specifically, the Court must weigh "the purpose of the Act to protect persons engaging in reasonable activities opposing discrimination, against Congress' desire not to prevent employers from legitimately disciplining their employees." *Laughlin*, 149 F.3d 253, 258, *citing Armstrong*, 647 F.2d at 448. Activities such as "complaining to the employer" and "participating in an employer's informal grievance procedures," when done in a manner that is "not disruptive or disorderly," have been held to be opposition activities protected under Title VII. *Hopkins v. Baltimore Gas & Elec., Co.*, 77 F.3d 745, 754 (4th Cir.1996); *Armstrong*, 647 F.2d at 448.

■ The Plaintiff is not required to establish the validity of the underlying allegations of a Title VII violation; nonetheless, in order to establish a retaliation claim, "the plaintiff must believe in the validity of the claim, and that belief must be reasonable." *Childress v. City of Richmond*, 907 F.Supp. 934, 940 (E.D.Va.1995), *aff'd* 134 F.3d 1205 (4th Cir. 1998) (en banc), *cert. denied*, — U.S. —, 118 S.Ct. 2322, 141 L.Ed.2d 696 (1998); *Mayo v. Kiwest Corp.*, 898 F.Supp. 335, 337, (E.D.Va.1995).

Applying these principles, Plaintiff cannot establish a prima facie case of retaliatory discharge for several reasons. First, it is doubtful that Plaintiff's conduct-merely repeating Tommy Combs' allegations to his supervisor, Haynes-can legitimately be considered "opposition." There is no evidence that Plaintiff confronted Norton directly with the allegations, counseled Combs to file a grievance or confront Norton himself, or took any other affirmative action to investigate the claim or have Norton disciplined. On this factual record, the Defendant's interest

in cultivating a cohesive management team and disciplining or terminating uncooperative managers significantly outweighs any Title VII purpose remotely implicated by the mere repetition of Combs' allegations.

Second, even if Plaintiff "opposed" Norton's alleged conduct, there is no evidence that Norton's conduct was an illegal discriminatory employment practice in violation of Title VII; at most, Norton put his arm around Janice Combs and talked to her about subjects unrelated to work, hardly the type of "severe and pervasive" sexual harassment required to establish a Title VII violation.[2] *See, e.g., Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 19, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) ("Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview"); *Hartsell v. Duplex Products, Inc.,* 123 F.3d 766, 772–73 (4th Cir.1997) (finding no Title VII violation where employee made numerous offensive and derogatory remarks regarding plaintiff and women in general); *Hopkins v. Baltimore Gas & Elec. Co.,* 77 F.3d 745, 751 (4th Cir.1996) ("Male supervisor's alleged sexual harassment of male employee, which included bumping into employee, positioning magnifying glass over employee's crotch, giving employee congratulatory kiss at employee's wedding, staring at employee in bathroom, commenting on employee's appearance and making inappropriate sexual comments [over a seven year period], was not sufficiently severe or pervasive to create objectively hostile or abusive work environment within meaning of Title VII").

Third, to the extent Plaintiff claims to have believed Norton's alleged conduct violated Title VII, such a belief would be unreasonable under the circumstances. Plaintiff did not contact Janice Combs to see how she felt about the incident or urge Tommy Combs to do anything about it, and stated himself that "that would have been the last thing I would have expected of anybody to say." Moreover, he knew that Tommy Combs had "a very volatile temper" and was "still upset" about his reprimand from the previous day. The ultimate falsity of Combs' statement further adds to the unreasonableness of Plaintiff's purported belief that sexual harassment had occurred.

■ Moreover, even if Plaintiff's actions could be said to constitute protected "opposition" to discriminatory practices, Plaintiff has failed to demonstrate a causal connection between his activity and the adverse employment action. "A causal relationship requires more than simple coincidence. Causation requires [that] the employer's action be the consequence of the protected activities and of nothing else." *Bray,* 905 F.Supp. at 328. Plaintiff's work performance had already been called into question, and Haynes, Norton, and Sebastian had met to discuss his future with CMI, undisputedly before Plaintiff's report of Tommy Combs' statements. Moreover, there was no discussion of Tommy Combs' allegations during the April 2 meeting regarding Plaintiff's housekeeping reports and his cooperation with other departments. Indeed, Bradley admittedly has no evidence that Norton or Mike Hopp, who ultimately approved the termination, were even aware of Tommy Combs' allegations at the time of Plaintiff's discharge.

■ Finally, even if Plaintiff were able to make out a prima facie case of retaliatory discharge, the Defendants would nonetheless be entitled to summary judgment. CMI has advanced a legitimate, non-retaliatory motive for Plaintiff's termination-namely, Plaintiff's lack of cooperativeness, refusal to accept correction, and pursuit of his own agenda instead of the corporate management philosophy-and thereby rebutted the presumption of discrimination arising from the supposed prima facie case. *See Amirmokri v. Baltimore Gas & Elec. Co.,* 60 F.3d 1126, 1130 (4th Cir.1995) (employer may "properly take into

---

2. To establish a sexual harassment claim based on a hostile work environment, the plaintiff employee must show: (1) the conduct was unwelcome; (2) it was based on the plaintiff's sex; (3) it was sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment; and (4) it was imputable on some factual basis to the employer. *Wrightson v. Pizza Hut of America, Inc.,* 99 F.3d 138, 142 (4th Cir.1996); *Spicer v. Virginia,* 66 F.3d 705, 710 (4th Cir.1995) (en banc).

account... subjective factors [such as] good interpersonal skills and... ability to lead a team.") Therefore, this presumption "drops from the case" and Plaintiff bears the ultimate burden to demonstrate that the non-retaliatory reason articulated by Defendants is pretextual *and* that retaliation was the true motive for his termination. *St. Mary's Honor Ctr.*, 509 U.S. at 515, 113 S.Ct. 2742; *DeJarnette v. Corning, Inc.*, 133 F.3d 293, 298 (4th Cir.1998). "[T]he plaintiff cannot avert summary judgment if the record is devoid of adequate direct or circumstantial evidence of discriminatory animus on the part of the employer." *Bray*, 905 F.Supp. at 328, *citing Theard v. Glaxo*, 47 F.3d 676, 680 (4th Cir.1995) (citations omitted).

Plaintiff has adduced no evidence that the complaints regarding his performance were so unfounded as to constitute a pretext for retaliatory discharge, and can cite no direct or circumstantial evidence of discriminatory or retaliatory animus. Whether CMI's decision was unfair, rash, or imprudent is irrelevant; in the absence of a discriminatory or retaliatory motive, Defendants' employment decisions may not be second guessed by this Court. As the Fourth Circuit recently held, " 'Title VII is not a vehicle for substituting the judgment of a court for that of the employer' ... [and] this Court 'does not sit as a kind of super-personnel department weighing the prudence of employment decisions made by firms charged with employment discrimination....' " *DeJarnette*, 133 F.3d at 298–99, *citing Jiminez v. Mary Washington College*, 57 F.3d 369, 377 (4th Cir.1995); *and Giannopoulos v. Brach & Brock Confections, Inc.*, 109 F.3d 406, 410 (7th Cir.1997).

### B. *"Public Policy Wrongful Discharge" (First Claim for Relief)*

■ Plaintiff's Second Claim for Relief alleges a claim entitled "Action for Wrongful Discharge." Plaintiff has apparently attempted to allege a claim based on the "pub-

lic policy exception" to North Carolina's general rule of at-will employment.[3] However, even taken in the light most favorable to the Plaintiff, the record indicates that there is no genuine issue of material fact and Defendants are entitled to judgment as a matter of law on this claim as well.

■ Under clearly established North Carolina law, unless an employment contract expressly states a specific term, employment is terminable at the will of either party. *See generally Coman v. Thomas Manufacturing Company*, 325 N.C. 172, 381 S.E.2d 445 (1989). At will employees may be terminated "for no reason, or for an arbitrary or irrational reason," but not "for an unlawful reason or purpose that contravenes public policy." *Sides v. Duke Univ.*, 74 N.C.App. 331, 328 S.E.2d 818, *disc. rev. denied*, 314 N.C. 331, 333 S.E.2d 490 (1985), *overruled in part on other grounds by Kurtzman v. Applied Analytical Industries, Inc.*, 347 N.C. 329, 331, 493 S.E.2d 420, 422 (1997). *See also McLaughlin v. Barclays American Corp.*, 95 N.C.App. 301, 382 S.E.2d 836, 840 (1989) (employee-at-will can be terminated for "indifferent and illogical" reasons). As a result, employees may not generally bring common law actions for wrongful termination except in narrowly defined circumstances in which the employee was terminated for a reason which violates the public policy of North Carolina. *Coman*, 325 N.C. at 175–78, 381 S.E.2d 445.

However, North Carolina courts have consistently held that "[t]he public policy exception to the employment-at-will doctrine is a 'narrow exception.'" *Roberts v. First–Citizens Bank and Trust Co.*, 124 N.C.App. 713, 721, 478 S.E.2d 809, 814, *app. withdrawn*, 345 N.C. 755, 487 S.E.2d 758 (1997), *quoting Williams v. Hillhaven Corp.*, 91 N.C.App. 35, 39, 370 S.E.2d 423, 425 (1988). *See also Strickland v. MICA Information Systems*, 800 F.Supp. 1320, 1326 (M.D.N.C.1992) (noting that "the only three successful wrongful

---

**3.** In the interest of judicial economy, the Court will retain supplemental jurisdiction over Plaintiff's state law claim despite its award of summary judgment on his Title VII claim. *See* 28 U.S.C. § 1367(a) (1998) ("in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United ed States Constitution").

discharge plaintiffs we find in reported North Carolina cases have had to choose between their jobs and violating the criminal law"), *quoting Harrison v. Edison Bros. Apparel Stores, Inc.*, 924 F.2d 530, 533 (4th Cir.1991), *reh'g en banc denied* (4th Cir. 1991).

Indeed, plaintiffs have been allowed to proceed with such an action only in a few specific, very narrowly defined circumstances. *See Coman, supra*, (discharge of truck driver for refusing to falsify driver records to show compliance with federal transportation regulations offends federal and state public policy); *Amos v. Oakdale Knitting Co.*, 331 N.C. 348, 416 S.E.2d 166 (1992) (discharging an employee for refusing to work for less than minimum wage violated public policy); *Sides*, 328 S.E.2d at 826–27 (termination of nurse for refusal to testify falsely or incompletely in medical malpractice trial against employer hospital violates public policy against perjury); *Vereen v. Holden*, 121 N.C.App. 779, 468 S.E.2d 471 (1996) (termination for engaging in political activity protected by the First Amendment violates public policy), *remanded on other grounds*, 345 N.C. 646, 483 S.E.2d 719, *and modified*, 127 N.C.App. 205, 487 S.E.2d 822 (1997); *and Harrison, supra*, (discharge for refusal of supervisor's sexual advances violates public policy against prostitution).

Numerous plaintiffs have attempted to avail themselves of this remedy, often on more compelling facts than those alleged in the instant case, but have failed. *See, e.g., Johnson v. Mayo Yarns*, 126 N.C.App. 292, 484 S.E.2d 840, *disc. rev. denied*, 346 N.C. 547, 488 S.E.2d 802 (1997) (employee's discharge for refusing to remove Confederate flag decal from his toolbox did not violate public policy); *Boesche v. Raleigh–Durham Airport Authority*, 111 N.C.App. 149, 153, 432 S.E.2d 137, 140, *app. dismissed*, 336 N.C. 304, 442 S.E.2d 320 (1994) (termination of airport maintenance mechanic for refusing to submit to employer drug testing does not violate public policy); *and Tompkins v. Al-*

len, 107 N.C.App. 620, 623, 421 S.E.2d 176, 178, *disc. rev. denied*, 333 N.C. 348, 426 S.E.2d 713 (1993) (allegation that supervisor altered inventory records to fabricate an excuse for plaintiff's discharge held insufficient to state a claim under public policy exception).

Although North Carolina courts have not clearly defined the boundaries of the public policy exception, the North Carolina Supreme Court has said, "At the very least public policy is violated when an employee is fired in contravention of express public policy declarations contained in the North Carolina General Statutes." *Amos*, 331 N.C. at 353, 416 S.E.2d at 169. It is questionable whether North Carolina has codified a public policy regarding termination allegedly in retaliation for reporting sexual harassment allegations. The North Carolina Equal Employment Practices Act, N.C. Gen.Stat. § 143–422.2 ("the N.C.E.E.P.A."),[4] has been held to permit an action for discharge in violation of public policy in gender discrimination cases. *See, e.g., Hughes v. Bedsole*, 48 F.3d 1376, 1383–84 (4th Cir.1995). However, as several courts have noted, this Act on its face "does not express any public policy concerning retaliation for opposition to any form of discriminatory practice" and no North Carolina court has interpreted it to establish a claim for retaliatory discharge. *Mullis v. Mechanics and Farmers Bank*, 994 F.Supp. 680, 688 (M.D.N.C.1997); *Chung v. BNR, Inc./Northern Telecom, Inc.*, 16 F.Supp. 632, 1997 WL 905520 (E.D.N.C.1997); *Leach v. Northern Telecom, Inc.*, 141 F.R.D. 420, 426 (E.D.N.C. 1991) (N.C.E.E.P.A. does not express public policy as to retaliation). · Since "extension of the public policy exception to include protection against retaliation for participation in other activities should come, if at all, from the North Carolina courts," the Court is not inclined to further expand the public policy exception to apply on the facts of this case. *Mullis*, 994 F.Supp. at 688.

**4.** N.C.Gen.Stat. § 143–422.2 (1997) reads in pertinent part:

It is the public policy of this State to protect and safeguard the right and opportunity of all persons to seek, obtain and hold employment without discrimination or abridgement on account of race, religion, color, national origin, age, sex or handicap by employers which regularly employ 15 or more employees.

Had Plaintiff offered any evidence that he was terminated for trying to report Norton's alleged conduct to the EEOC or other authorities, or for his refusal to keep quiet about Combs' allegation in the face of a lawsuit or investigation, he might be able to fit within the "narrow" public policy exception for wrongful discharge actions (based on *Sides* and *Coman*). However, the record contains no such evidence; rather, it is undisputed that Plaintiff merely repeated Combs' allegations to his supervisor and took no further action to see that they were investigated or that Norton was reprimanded. Indeed, he did not even bring up the matter during his meeting with Norton, Sebastian and Haynes the day after he relayed Combs' comments to Haynes.

Finally, the conduct actually described by Combs—even had it proven true—did not in any way violate federal or state anti-discrimination law, as noted above. *See North Carolina Dep't of Correction v. Gibson*, 308 N.C. 131, 301 S.E.2d 78, 82 (1983) (holding that claims of discharge in violation of North Carolina public policy are analyzed under the same evidentiary patterns and standards of law as federal Title VII claims). Therefore, the Plaintiff could not establish that he was discharged in retaliation for opposing discriminatory activities even if a state retaliatory discharge cause of action existed. In short, there is no basis in fact or law to support Plaintiff's state law claim for wrongful discharge in violation of public policy.

### III. ORDER

**NOW THEREFORE, IT IS ORDERED:**

· 1. "Defendant's Motion for Summary Judgment" filed June 8, 1998 (document # 9) is **GRANTED** in its entirety and the Complaint is hereby **DISMISSED WITH PREJUDICE.**

2. The Clerk is directed to send copies of this Memorandum and Order to counsel for the parties.