**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

CHERYL S. CONNER,
Plaintiff-Appellant,

v.

No. 98-2055

SCHRADER-BRIDGEPORT
INTERNATIONAL, INCORPORATED,
Defendant-Appellee.

Appeal from the United States District Court
for the Western District of Virginia, at Danville.
Jackson L. Kiser, Senior District Judge.
(CA-96-38-D)

Argued: January 25, 2000

Decided: September 13, 2000

Before MOTZ and KING, Circuit Judges, and
John T. COPENHAVER, Jr., United States District Judge for the
Southern District of West Virginia, sitting by designation.

_____

Reversed and remanded by published opinion. Judge King wrote the
opinion, in which Judge Motz and Judge Copenhaver joined.

_____

**COUNSEL**

**ARGUED:** Barbara Rubin Hudson, Evanston, Illinois, for Appellant.
Arthur Bruce Sternberg, PEDERSEN & HOUPT, Chicago, Illinois,
for Appellee.

_____

**OPINION**

KING, Circuit Judge:

Cheryl Conner appeals the district court's adverse judgment on her Title VII hostile work environment claim. The lower court vacated a jury verdict in favor of Ms. Conner and granted judgment as a matter of law and a conditional new trial to her former employer, Schrader-Bridgeport International ("SBI"). We now reverse the district court's judgment and remand for reinstatement of the jury's verdict.

I.

Ms. Conner originally raised three claims against SBI in her civil action filed on July 1, 1996 in the Western District of Virginia. She claimed SBI: (1) discharged her on account of her gender, in violation of Title VII, 42 U.S.C. § 2000e et seq. ; (2) subjected her to a hostile work environment, also in violation of Title VII; **1** and (3) willfully violated the Equal Pay Act, 29 U.S.C. § 255(a). Prior to trial, the district court dismissed the claim of discriminatory discharge. After a five-day trial in late November and early December 1997, the jury found in Ms. Conner's favor on both the hostile work environment and equal pay claims. On her hostile environment claim, the jury awarded Ms. Conner $20,000 in compensatory damages and granted punitive damages against SBI in the sum of $500,000. On the Equal Pay Act claim, the jury found the employer's violation "willful," and it awarded Ms. Conner $1,700 in compensatory damages. Upon considering post-trial motions, the district court, on April 30, 1998, entered judgment on the jury's verdict against SBI for $1,700 on the equal pay claim, plus an additional $1,700 in liquidated damages for willfulness. The district court, however, granted SBI's motion for judgment as a matter of law on the hostile work environment claim, and it awarded SBI a conditional new trial pursuant to Rule 50 of the Federal Rules of Civil Procedure. The district court alternatively granted a reduction in damages and a remittitur of an unspecified

---

**1** A "hostile work environment" is also often referred to as an "abusive work environment." See, e.g., Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 66 (1986).

amount, unless Ms. Conner elects a new trial. Ms. Conner appeals the judgment in favor of SBI on the hostile work environment claim.

II.

A.

When reviewing a district court's entry of judgment as a matter of law, we must view the facts in the light most favorable to the non-moving party. See, e.g., Brown v. CSX Transp., Inc., 18 F.3d 245, 248 (4th Cir. 1994). We accordingly recite the facts presented in support of Ms. Conner's hostile environment claim in that light.

B.

SBI manufactures high-performance valving for automotive systems, and it includes Ford, General Motors, Toyota, and Honda among its customers. SBI's corporate headquarters is in Illinois, and it has several manufacturing plants in the United States (Virginia, North Carolina, California, New York, and Oklahoma) as well as in Ireland, Italy, India, Brazil, and Mexico. Its annual gross sales from 1993 to 1995 were about $75 million, with sales to approximately six thousand customers worldwide.

Ms. Conner began work in 1984 as a temporary unskilled factory worker at the manufacturing plant in SBI's Piedmont Manufacturing Division in Altavista, Virginia. By 1992, she was working as a permanent employee in SBI's "cap and core room," assembling the stems on car and truck tires. J.A. 93.

In 1993, SBI moved a production process to its Altavista plant that used complex specialty equipment -- Acme-Gridley multi-spindle machines.[2] SBI created its Department 710 for this new production

_____

**2** The record establishes that each Acme-Gridley machine was approximately 20 feet in length. Machine operators fed metal bars twelve to fourteen feet long and weighing as much as 70 pounds into the machine. After the machine processed the metal bars into parts, the finished parts dropped from the machine into a pan; the Acme-Gridley machine opera-

3

work at Altavista, and it advertised for skilled machine operators. After Ms. Conner passed an initial screening examination, she was permitted to enroll in a special training class for such operators at a local community college. Upon completing the class, Ms. Conner and twenty others took a mandatory hands-on examination. This examination tested each student's ability to diagnose and correct malfunctioning machines within a limited time period. Ms. Conner and one of her co-workers tied for the highest score on this exam.

In support of her claim of a hostile work environment with respect to women, Ms. Conner presented evidence of the following categories of conduct by her supervisors and other authorized personnel: (1) disparate, lesser training; (2) unauthorized disciplinary action against her; (3) extra burden in her job assignments; (4) disparate floor mopping duty; (5) verbal disparagement; (6) forced display of bloody pants; (7) failure to investigate her disparate treatment allegations; (8) lower pay rate; (9) timing her breaks with a stopwatch; and (10) termination threat as a response to her discrimination complaint.

1. Disparate, Lesser Training of Ms. Conner

In May 1993, SBI hired Ms. Conner and a number of men (who had also completed the community college course) for the position of "craftsman (skilled)" to operate the multi-spindle machines in Department 710. J.A. 1002. Men who did not have prior experience operating the Acme-Gridley machines were first temporarily placed in SBI's Department 767, where they received an additional six months of one-on-one, hands-on training, and were taught how to properly load metal bars into the machines. These men were then transferred to Department 710, where they began operating the machines. Like these men, Ms. Conner had no prior experience operating the Acme-

_____

tor then carried the full pan of oil-covered parts to a degreaser. Full pans of parts weighed up to 100 pounds.

The atmosphere around these machines was dense with the oil required to run them smoothly. Machine operators regularly were required to submerge their arms in oil; vaporized oil from the machine would fall and settle, covering the machine operators' clothes, hair, and skin, as well as the floor around the machine.

4

Gridley machines, other than the training acquired in the community college class. SBI, however, did not place Ms. Conner into Department 767, but placed her directly into Department 710. Thus, she did not receive the additional six months of training provided to the male machine operators initially placed in Department 767.**3**

George Schaefer, SBI's foreman and supervisor in Department 710, was responsible for pay raises, promotions, discipline, and terminations within the Department. On numerous occasions during the period when Ms. Conner was employed in Department 710, Schaefer stated explicitly that, in his view, women did not belong in the workplace at all. However, Schaefer testified at trial that he believed Ms. Conner had "excellent mechanical ability," and estimated that of the ten persons SBI hired from the community college training program, Ms. Conner was "probably number three from the top." J.A. 677.

In May 1993, Ms. Conner was assigned to work on the second shift

_____

**3** When SBI hired additional machine operators in 1994, the men hired were again initially assigned to Department 767 for several months before being transferred into Department 710. As with Ms. Conner's placement in the previous year, SBI also placed Debra Rorer, another female hired into Department 710, directly into that Department without interim training in Department 767. In fact, the supervisor, George Schaefer, did not allow Ms. Rorer to operate Acme-Gridley machines for six months after she was hired as a machine operator in August 1994.

When Ms. Rorer complained, Schaefer attempted to transfer her to a different department where women performed assembly work. However, Ms. Rorer insisted that she should be trained to operate the Acme-Gridley machines, and the personnel manager, Mr. Keller, intervened on her behalf. Keller required Schaefer to permit Ms. Rorer to continue to work in Department 710, as she had been hired to do. Ms. Rorer was then assigned to operate the Acme-Gridley machines, and she worked on the same shift as Ms. Conner prior to Ms. Conner's termination.

A third female operator hired in Department 710, Stacey Haskins, also received no training. Schaefer showed Ms. Haskins how to turn on her machine and told her that the next day she would run the machine by herself. Hence, the men who worked in Department 710 received additional training that was not provided to any of the women who performed the same work.

5

(3:30 p.m. to 2:00 a.m., including mandatory overtime) in Department 710. J.A. 188. However, an auto accident the following month hospitalized her and caused an eight-week medically excused work absence. Upon her return, she did not receive the regular training in machine operations that the men hired with her were receiving. For example, when a machine malfunctioned, supervisor Bruce Boyd would explain and demonstrate to the male operators how to fix the machine, and he permitted the male machine operators to assist him. If Ms. Conner's machine malfunctioned, however, Boyd simply fixed it without showing or explaining what he did, "rolled his eyes" at her, and refused Ms. Conner's requests to participate and to learn how to fix the machines.[4] J.A. 104. Ms. Conner specifically asked Mr. Schaefer to see that she was provided with comparable training. However, he dismissed her request by responding that she had a high rate of absenteeism. J.A. 660. Mr. Schaefer took no action to improve Ms. Conner's training in machine operating techniques.

Boyd also instructed the male machine operators, on an ad hoc basis, on special procedures essential to operation of the Acme-Gridley machines. For example, some machines processed round metal bars, whereas others processed hexagonal bars. The round bars would fall into place when the machine operators beat them in to the machines. In contrast, beating on the hexagonal bars achieved nothing, as those bars had to be turned gently by hand until they slipped into place. Significantly, Ms. Conner received absolutely no instruction or assistance on how to load the hexagonal bars. When she tried to beat them into place, Boyd and Schaefer mocked her and laughed at her failure. In fact, they also encouraged other male employees to laugh at her.[5] At home at night, Ms. Conner cried and soaked her blistered hands, acquired from her attempts to force the hexagonal bars into the machines. When she asked her brother, fellow employee Jay

---

[4] Likewise, when co-worker Stacey Haskins's machine malfunctioned, Boyd fixed it without showing her what he did. When Ms. Haskins asked Boyd how he fixed the machine, he responded, "Never mind, just run it now."

[5] The men also laughed at Ms. Rorer in 1995 when she began working on the Acme-Gridley machines, as she tried to beat hexagonal bars into place before learning how to properly load them. Ms. Conner then taught Ms. Rorer how to load the hexagonal bars.

Shelton, to show her how to load the hexagonal bars, he came to work early on his own time and did so. Ms. Conner was thereafter able to load the bars successfully.[6]

However, supervisor Boyd and Mr. Schaefer both accused Ms. Conner of having her brother do her work for her, and they transferred her away from Mr. Shelton to work on the first shift (7:00 a.m. to 3:00 p.m.). J.A. 109, 274. Even then, Mr. Shelton continued to donate his personal time to training his sister in machine set-ups[7] and tool settings. Such set-ups and tool settings were difficult but necessary skills for a machine operator, in order to prevent a machine malfunction from disrupting production. When it became apparent to Ms. Conner's supervisors that she was not relying on her brother to do her work, and that she actually preferred working on the first shift, she was transferred back to the second shift.

2. Unauthorized Disciplinary Action Against Ms. Conner

In the Fall of 1993, SBI granted Ms. Conner general permission to leave work early when there were no tasks for her to perform, consistent with its policy of permitting employees to volunteer to leave when there was a lack of work. Then, in November 1993, because Ms. Conner had been leaving work early, Mr. Schaefer denied her a regular pay increase to $9.08 per hour, instead assigning her a lower $8.55 per hour pay rate.

Significantly, alterations in an employee's pay rate on the basis of asserted attendance problems were not authorized by SBI's disciplin-

_____

[6] Mr. Shelton was also an Acme-Gridley machine operator on the second shift and had received training in Department 767. He witnessed the Department 710 employees making fun of Ms. Conner when she tried to load the machines with hexagonal bars, and he observed that no one would assist her.

[7] When a machine operator changes a machine's settings in order for the machine to produce a different part, the operator performs a "set-up." This process involves changing the machine's tooling, and adjusting each tool according to blueprint specifications. Machine operators who performed set-ups were ranked at a higher grade, and thus received higher pay rates.

ary policy. SBI's "Work and Safety Rules" provide only that an employee who engages in prohibited practices (including repeated tardiness or absenteeism, and leaving work during scheduled work hours without authorization) "shall be subject to discharge, suspension, or a written or oral reprimand as appropriate." J.A. 973. Ms. Conner had never been disciplined in her SBI employment for any reason during the prior nine years. J.A. 115.

3. Extra Burden in Ms. Conner's Job Assignments

Because the Acme-Gridley machines were idiosyncratic-- each required its own particular techniques in order for it to perform well -- new machine operators were typically assigned to a specific machine and first learned how to keep that particular machine operating. An inexperienced machine operator would then advance to learning machine set-up and unplanned tool-setting only after having gained basic operating skills on a single machine. As a result of single-machine training, the machine operator's efficiency and productivity were greater. Contrary to this usual practice, however, Mr. Schaefer repeatedly moved Ms. Conner from one machine to another. This caused her to spend a much greater proportion of her time on machine set-up and unplanned tool setting rather than on production, as compared to her male co-workers. For the period from October 1994 through April 1995, Ms. Conner spent 139.3 hours on machine set-up and unplanned tool setting.[8] J.A. 993. By comparison, male Acme-Gridley machine operators in Department 710 spent only 82.5, 48.3, 40.9, 15.5, 12.2, and 12.1 hours on these activities during the same time period. Id.

Ms. Conner was also assigned to operate Acme-Gridley machines that were producing dissimilar products and thus had dissimilar tool settings. These assignments differed from those of male machine operators, who operated machines that were producing similar products. Not unexpectedly, the machine operators that produced similar products obtained greater efficiency and productivity, resulting from the uniformity of their work and the ability to directly transfer knowledge gained from one machine's functioning to other machines per-

_____

[8] Likewise, Ms. Haskins spent 131.3 hours on these tasks during the same period.

8

forming the same tasks. Ms. Conner's disparate assignments prevented her from obtaining an equivalent efficiency and productivity.

Male machine operators were also assigned to operate machines that were located in a more convenient manner, side by side, again promoting greater efficiency and productivity. By contrast, Ms. Conner was assigned to operate machines that were physically separate from one another, so that she would have to leave one machine unattended if she had operating problems on a distant machine. Being unable to simultaneously watch her machines had adverse practical consequences. For example, when an Acme-Gridley machine broke a drill bit and Ms. Conner could not see the machine from across the factory, it "wiped out all the tooling before I could even know it -- know it wasn't producing work . . . it took probably three to four hours to get it set back up and running."[9] J.A. 135. Ms. Conner's assignments to machines that were far apart from each other further affected her efficiency and productivity. The extra complexity of Ms. Conner's duties also caused her to experience heightened job-related stress.

4. Disparate Floor Mopping Duty

If Ms. Conner asked for assistance, or if her machine malfunctioned, Mr. Schaefer regularly stated to her, "You can mop the floor. That's something you can do. You -- You should already know how to mop the floor." J.A. 113. Even when her machine was functioning properly, if a male operator's machine failed, Schaefer would reassign the male operator to Ms. Conner's functioning machine and would order Ms. Conner to mop the Department's entire floor, on both sides of all the machines. On those occasions, Ms. Conner lost the credit that she would have received for producing parts with her machine.

While Ms. Conner manually mopped the floor of the Altavista plant using a large mop and a bucket for squeezing the mopped oil and water into, her co-workers would shout at her,"Cheryl, mop the floor. Mop the floor, Cheryl. At least you could do that." J.A. 138-39.

_____

[9] Mr. Schaefer also required one of the other female operators, Ms. Rorer, to operate machines that were physically separated.

9

These events occurred regularly, approximately fifteen times per month. On the other hand, male operators mopped the floors around their own machines, but were not required to mop the entire floor unless it was at the end of the day. In these instances they received overtime pay for doing so, and unlike Ms. Conner (who was required to use a hand mop and bucket), the male operators rode a cleaning machine with a large "squeegee" on the bottom of it to mop the floor.[10] J.A. 163.

Schaefer justified his decisions in this regard by stating to Ms. Conner, "Why would I take a qualified machine operator and have them mop the floor and you run a [multi-spindle] machine?" J.A. 293. Conversely, the male machine operators were not ridiculed when they performed mopping tasks. Ms. Conner's mopping assignments resulted in her being less productive than the male operators and caused her to suffer substantial stress.

5. Verbal Disparagement of Ms. Conner

When Ms. Conner became frustrated in dealing with a malfunctioning machine, Mr. Schaefer would ask her, within the hearing of other employees, "Are you on the rag today? Didn't you get any last night?" J.A. 134. This occurred approximately ten to twenty times per month.[11] J.A. 239. By contrast, when male machine operator Noel Farrell became angry due to balky machinery, he was neither ridiculed nor disciplined when he left his shift early without permission, merely announcing, "I'm leaving . . . I'm sick of this. I'm frustrated." Id.

Ms. Conner suffered from daily headaches and nausea resulting from the humiliation she experienced at work. She was unable to take

_____

[10] Of significance, Mr. Schaefer also required the other female co-workers, Ms. Rorer and Ms. Haskins, to mop the entire floor during their regular work shifts, which prevented them from operating their machines during that time. Ms. Rorer mopped the entire floor approximately three times per week.

[11] Schaefer also made similar derogatory remarks to Ms. Haskins, such as "Are you on the rag?," on three occasions when she was not smiling or in a good mood. J.A. 326-27. Ms. Haskins would cry later at home from the degradation of Schaefer's remarks.

10

the medication prescribed for her symptoms, though, because its label warned her not to work around heavy equipment while taking it. Ms. Conner hated going to work because of the humiliation that she experienced there. However, because Ms. Conner was the sole support for her young son, she was unable to resign, and she lived in constant fear of losing her job at SBI.

6. Forced Display of Bloody Pants

In January 1994, Ms. Conner was briefly hospitalized due to uterine hemorrhaging. She experienced several unexpected episodes of uterine bleeding during the remainder of her employment at SBI, until her May 1995 termination. If the bleeding was heavy, she became faint, which was dangerous if she was near the active machinery. To stop the bleeding, Ms. Conner had to remain immobile in bed for a period of time. Approximately ten of these bleeding incidents occurred at work, between January 1994 and May 1995.

Each time a hemorrhaging episode occurred at work, she wrapped a rag around her waist to cover her bloodied pants, went to Schaefer's office, and asked for permission to go home. Ms. Conner was acutely embarrassed by the visible bloodstains on her pants. In such situations, Schaefer told Ms. Conner, "You show me that you're bleeding, and I'll let you go." J.A. 137. Significantly, Schaefer never referred Ms. Conner to SBI's on-site nurse for a medical verification of her problem. Ms. Conner's co-workers could see her unwrap the rags from her waist to display her bloodied pants to Schaefer in his open office, which also had a large glass window facing the factory work area.

7. Failure to Investigate Disparate Treatment Complaints

Beginning in January 1994, Ms. Conner complained on numerous occasions to the plant's personnel manager, Mr. Keller, concerning her improper treatment by Mr. Schaefer. SBI's "Anti-Harassment Policy" required investigation of employee complaints "thoroughly and promptly to the fullest extent practicable." J.A. 1067. During 1994, Ms. Conner spoke to Mr. Keller on three separate occasions about the unreasonable differential treatment to which she was subjected by her supervisors in the workplace. Indeed, she asked Mr. Keller to observe

11

her supervisors' treatment of the employees in Department 710 and to investigate further.

Despite these complaints, Keller failed to either observe how Ms. Conner was treated or review her daily labor activity sheets. These activity sheets demonstrated that Ms. Conner spent far more time on machine set-ups and unplanned tool settings than the male machine operators. Instead, Keller simply spoke to Ms. Conner's supervisors, Schaefer and Boyd, about her. Mr. Keller concluded from those conversations that Ms. Conner was not treated differently from other employees. Although Keller had assured Ms. Conner that he would contact her after investigating her complaints, he failed to follow through.

8. Lower Pay Rate for Ms. Conner

In March 1994, Mr. Schaefer evaluated Ms. Conner's attendance and production quantity as "satisfactory." According to Boyd, Ms. Conner had no performance or aptitude problems in her job, and she was among the top employees of the Altavista plant with respect to her ability to keep the Acme-Gridley machines functioning. Mr. Keller agreed that there was never any problem with Ms. Conner's quality and quantity of production, her attitude, or her safety record at work.

However, in March 1994, Ms. Conner was advised that she would not receive a pay raise comparable to that received by male operators who were less experienced and less skilled than she was, because of her absences from work. She asked Mr. Schaefer to explain why she was not classified in the set-up pay grade. To qualify for the higher pay grade, a machine operator must have learned how to set up her machine. Ms. Conner regularly performed set-ups for male machine operators who could not perform their own set-ups, but the men received the higher set-up pay rates. Indeed, she sometimes came into the plant on Sunday (a regular day off) to perform set-ups for male machine operators. Mr. Schaefer responded that she would do what she was told to do -- without question -- or she could leave. During the period from October 1994 through April 1995, SBI paid a number of male machine operators -- who were hired after Ms. Conner -- $10.47 per hour to perform the skilled tasks of machine set-ups and

12

unplanned tool setting. These men performed these skilled tasks less frequently than Ms. Conner did, but Ms. Conner was paid a rate of only $9.44 per hour -- over a dollar per hour less than the male co-workers.**12**

On September 9, 1994, Ms. Conner overslept her 7:00 a.m. starting time, and at 7:25 a.m. she called the plant to inform them that she would be at work as soon as possible. When she arrived, Mr. Keller counseled her about her "intolerable" and"unacceptable" performance, and he included a written warning to her, based on thirty-six absences and eight tardies for the year. Of those absences, twenty were medically excused accompanied by a doctor's note, and five were vacation days.**13** Later, in November 1994, Schaefer evaluated

_____

**12** Ms. Haskins and Ms. Rorer were also paid less than the male machine operators who performed the same specialized work, and their pay progression ceased shortly after their employment began. Ms. Haskins achieved a pay rate of $8.53 per hour, and Ms. Rorer attained an $8.08 per hour rate.

Ms. Conner advised her supervisor that her lower pay rate was unfair, especially considering that a male co-worker, Noel Farrell, was regularly tardy and left work early without permission, and that he did so without being disciplined. Shortly afterwards, Farrell received a written warning that documented two incidents of tardiness, and advised him that another unexcused tardiness would result in a three-day suspension. (Farrell's attendance record at the Altavista plant does not show either of the two tardy arrivals referenced in his supervisor's written warning.)

When Ms. Conner missed two days of work in August 1994 due to an unexpected death in her family, she was placed on suspension for two days without pay because of an unexcused absence. She complained to Mr. Schaefer that her suspension was unfair, in light of Farrell's regular unexcused absences that were not disciplined. Five days later, Farrell was suspended for one day without pay when he arrived two hours late without an excuse.

**13** At trial, Schaefer incorrectly characterized Ms. Conner's attendance record as "by far the worst" and "still probably one to two times greater than the next person in the [D]epartment," even excluding her medically necessary absences.

Ms. Conner had 36 unexcused absences during her SBI employment. In comparison, male operators Richard Harvey and Jay Shelton had 36

13

Ms. Conner's attendance and production quantity as"satisfactory," the same as on her previous evaluations, and noted that her "attendance and attitude . . . has much improved." J.A. 979.

9. Timing Ms. Conner's Breaks with A Stopwatch

In late 1994, Mr. Boyd followed Ms. Conner about the plant with a stopwatch, timing her while she was in the ladies room and when she was on breaks. He engaged in timing Ms. Conner's breaks for approximately a month and a half. By contrast, Boyd did not time male machine operators.

On January 3, 1995, Mr. Schaefer evaluated Ms. Conner's performance as "barely meets requirements" for production quantity and stated that she was "slightly neglectful" in attendance. He concluded that Ms. Conner needed to improve her "attendance, production and performance." However, there was no consideration given to the disproportionate amount of time that Ms. Conner had been assigned to machine set-ups and unplanned tool setting, or the time that she spent mopping the Department's entire floor area.

Then, in early January 1995, SBI disciplined Ms. Conner for returning eight minutes late from a timed break that began when she entered the ladies room to wash off machine oil. [14] In contrast, breaks

_____

and 44 absences, respectively, for the same time period (May 1993 through May 1995). Shelton was never disciplined based on his absences, and according to the plant manager, Martin Giudice, Shelton's absences were about average, not excessive. Similarly, SBI's records show that Noel Farrell had 27 absences and 28 tardies from December 1993 (when he began working at the plant) to May 1995. See supra note 12 (SBI's records overstated Farrell's actual work attendance).

[14] In comparison, Mr. Schaefer failed to discipline male machine operator Richard Harvey when, on January 13, 1995, Harvey pulled out his knife and started to sharpen it while Mr. Schaefer spoke to him about inappropriate actions the previous day -- when Harvey threw a knocker rod at work that could have injured others, and when he purposely broke a machinery part. In response to Harvey's knife-sharpening activity, Schaefer told Harvey that he was scaring Schaefer. According to Schaefer, "it was clear he was trying to intimidate me."

14

by the male machine operators did not begin until after they had completed cleaning machine oil off of themselves and had exited the restroom. Male machine operators also frequently extended their breaks for an extra ten minutes, without any reprimands for doing so. In fact, Ms. Conner often operated the machines of her co-workers during the time that they overstayed their breaks.

10. Termination Threat as Response to Discrimination Complaint

On January 18, 1995, Ms. Conner requested a meeting with the Piedmont Manufacturing Division's president and plant manager, Martin Giudice, concerning differences between the employment conditions for her and those of her male co-workers. Mr. Giudice prepared for the meeting by reviewing Ms. Conner's record; he decided that in the meeting, he would express to her his disapproval of her attendance record.

This meeting took place on January 23, 1995, with Ms. Conner, Mr. Giudice, and Mr. Keller in attendance. According to Ms. Conner, during the meeting Mr. Giudice dismissed her complaints by directing her to do what her supervisor told her to do, and further directing her not to worry about what male machine operators in the Department were doing. Ms. Conner responded that, in her view, Giudice's response constituted sexual discrimination. Giudice then slammed his fist down on his desk, stood up, and screamed at her that "if this ever comes out of your mouth again, you will be fired right here on the spot right now." J.A. 155. Ms. Conner sat mute and crying for the remainder of the meeting, and then exited. Stacey Haskins, who happened to be in the hallway outside Giudice's office at the time, saw that Ms. Conner was upset and crying as she left the meeting.

At trial, SBI presented evidence that Mr. Keller wrote a memorandum describing the January 1995 meeting, which vaguely characterized Ms. Conner as having complained of unfairly being selected by her supervisors for monitoring and discipline. Significantly, this memorandum did not note any response to Ms. Conner's complaint. Keller's memorandum states that Mr. Giudice informed Ms. Conner that her attendance was "unacceptable," and that if she failed to change her behavior her employment would be terminated. Keller failed to record any mention of sexual discrimination. Both Giudice

15

and Keller signed the memorandum, which was placed in Ms. Conner's employment record. Ms. Conner was not informed of the memorandum's existence and did not review it at any time while she was employed at SBI.**15**

C.

On May 30, 1995, SBI terminated Ms. Conner's employment, stating that her excessive absences were its reason. Mr. Keller testified that he calculated that approximately 34% of Ms. Conner's 1994 absences occurred on a Monday, and that in his experience, such a higher than usual absence rate is often associated more with weekend activities rather than illness. Keller had not, however, performed the same calculation for any other machine operators, and when he did so at trial, he acknowledged that male operators Harvey and Shelton had approximately 59% and 82% of their absences, respectively, on work days associated with weekends. See also supra note 13.

III.

A.

We review de novo a district court's grant of judgment as a matter of law. See Brown, 18 F.3d at 248. A motion for judgment as a matter of law after a verdict is returned is properly granted only if "there is no legally sufficient evidentiary basis for a reasonable jury to find for that party with respect to that issue." Fed. R. Civ. P. 50. We view the evidence in the light most favorable to the non-moving party to determine "whether a reasonable trier of fact could draw only one conclusion from the evidence." Brown, 18 F.3d at 248 (citation omitted); see also Lowery v. Circuit City Stores, Inc., 206 F.3d 431, 437 (4th Cir. 2000). If, giving the non-movant the benefit of every legitimate inference in her favor, there was evidence upon which the jury could reasonably return a verdict for her, we must reverse the judgment below.

_____

**15** Four days after Ms. Conner's meeting with Giudice, on January 27, 1995, Mr. Giudice called Ms. Haskins into his office. He asked her if she had been sexually harassed during her employment, and he emphasized that he had an open-door policy to talk with employees on any issue whatsoever.

See Mays v. Pioneer Lumber Corp., 502 F.2d 106, 107 (4th Cir. 1974).

A sexual harassment claim due to a hostile or abusive work environment requires proof of: (1) unwelcome conduct; (2) that is based on the plaintiff's sex; (3) which is sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment; and (4) which is imputable to the employer. See Spicer v. Commonwealth of Va. Dep't of Corrections , 66 F.3d 705, 709-10 (4th Cir. 1995) (en banc) (citing Harris v. Forklift Sys., Inc., 510 U.S. 17 (1993)).

The parties do not dispute the first and fourth prongs, i.e., that Ms. Conner experienced unwelcome conduct that was imputable to the employer through the actions of Mr. Schaefer and Mr. Giudice. As to the second prong, that such conduct was based on Ms. Conner's gender, we agree with the district court's rejection of SBI's argument that Ms. Conner's sexual harassment claim must fail because she did not establish conduct of a "sexual nature."[16] On appeal, SBI does not dispute the district court's ruling on this issue.

The issue here therefore relates only to the third prong of a hostile environment claim. Under Harris, the Supreme Court determined that "[t]he conduct in question must be judged by both an objective and a subjective standard: [t]he conduct must be severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive, and the victim must subjectively regard that environment as abusive." Harris, 510 U.S. at 21-22.

Harris directs that we must look at all the circumstances to determine whether a work environment is hostile or abusive, including: (1)

_____

[16] Actionable discrimination includes conduct "because of" the victim's gender, which is broader than conduct of a "sexual nature." See Oncale v. Sundowner Offshore Serv., Inc., 523 U.S. 75, 79-81 (1998). The district court correctly concluded that here, sufficient evidence supported a finding that Ms. Conner's gender was the cause of complained-of conduct such as the comments, "Are you on the rag?" and "Didn't you get any last night?" as well as the requirement that the female operators mop the floor more frequently than the male operators.

17

the frequency of the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating, or a mere offensive utterance; (4) whether the conduct unreasonably interfered with the plaintiff's work performance; and (5) what psychological harm, if any, resulted. See id. at 23; Smith v. First Union Nat'l Bank, 202 F.3d 234, 242 (4th Cir. 2000) (citing Harris, 510 U.S. at 23). Ms. Conner asserts error in the district court's determination that no "actionable" harassment occurred during the applicable period"[b]ecause none of the conduct complained of by Conner rises to the level required to be compensable under Title VII." J.A. 1098.

B.

In its post-trial decision, the district court identified nine separate categories or types of conduct evidenced at trial. These categories are as follows:

> (1) male employees mocked Ms. Conner when her machine malfunctioned;
>
> (2) her supervisor asked her, "Didn't you get any last night?" and "Are you on the rag?";
>
> (3) she and the other women were forced to mop the floor when their machines broke down and were told in a condescending manner that "at least [they] could mop the floor";
>
> (4) she was singled out for discipline relating to her absences;
>
> (5) Schaffer made her remove the rags that she used to cover her bloodstained pants;
>
> (6) she was timed with a stopwatch when she went to the bathroom;
>
> (7) she was assigned to machines at opposite ends of the factory, requiring her to run back and forth;

18

(8) she was given less training than male machine operators; and

(9) in response to her complaints of unfair disparate treatment, Giudice threatened to fire her if she ever mentioned the words "sexual harassment."

J.A. 1095-96. However, the district court erred when it analyzed these categories of Ms. Conner's evidence in a disaggregated fashion, contrary to Harris's "totality of the circumstances" test. The court concluded that the "only allegations that are even remotely close to meeting the severe and pervasive threshold are the comments, `Are you on the rag?' and `Didn't you get any last night?'" and the court analyzed those comments independently of the "totality" of the situation. See Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81-82 (1998) ("The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed."); Williams v. General Motors Corp., 187 F.3d 553, 562-63 (6th Cir. 1999) (evidence of sexually related remarks, foul language, and mean and inequitable treatment by co-workers gave rise to a jury question, because impact of separate successive incidents may accumulate to create hostile environment); Jackson v. Quanex Corp., 191 F.3d 647, 660 (6th Cir. 1999) (citation omitted) (improper to consider each offensive event in isolation, "as the very meaning of `environment' is `[t]he surrounding conditions, influences or forces which influence or modify").

The district court characterized "[t]he mocking, the mopping, the singling out for discipline, the timing with the stopwatch, the machine assignments, the disparate training and the threats by Giudice" as merely evidence "revealing the work environment to be `unpleasant and sometimes cruel.'" It then dismissed each of these types of conduct as "at most bothersome incidents." J.A. 1097 (citation omitted). In this regard, in addition to improperly disaggregating the incidents from the whole, the district court adopted the view that these incidents were not discriminatory, and thus erred by failing to draw all reasonable inferences in favor of Ms. Conner. Cf. Reeves v. Sanderson Plumbing Prod., Inc., No. 99-536, slip op. at 17 (U.S. June 12, 2000)

19

(court misapplied standard of review under Rule 50 by disregarding evidence that supported plaintiff's prima facie case and undermined the employer's nondiscriminatory explanation).

C.

As a preliminary matter, in its post-trial memorandum order granting judgment as a matter of law, the district court erred in determining that certain evidence presented by Ms. Conner was "irrelevant and prejudicial." We construe the court's post-trial determination to be a reversal of its decision during trial that the evidence was admissible; the district court is fully empowered to reverse its evidentiary rulings post-trial and to reconsider that evidence's effect on the trial. See Weisgram v. Marley Co., 120 S. Ct. 1011, 1015 (2000). However, upon review, we must conclude that the district court properly admitted the evidence during trial, and that its post-trial decision reversing its prior evidentiary rulings was erroneous. General Elec. Co. v. Joiner, 522 U.S. 136, 141-42 (1997) (abuse of discretion standard of review for district court's evidentiary rulings).

1.

With respect to the comments the district court credited as potentially severe or pervasive ("Are you on the rag?" and "Didn't you get any last night?"), after the jury returned its verdict, the court found that the evidence that Department 710 was an unpleasant place to work was "irrelevant and prejudicial." J.A. 1103-04. The court concluded that such comments were simply insufficient to constitute harassment, in light of the "rugged environment" of physically demanding work that usually caused the machine operators to be covered in oil. J.A. 1096. The court indicated that "[t]hose of us who work in refined office jobs where socially imposed speech codes predominate must not lose sight of the fact that Title VII was not meant to transform the rough into the sublime." Id. However, Ms. Conner does not take issue with the physically demanding, rough, and oily workplace (indeed, the evidence demonstrates that she performed the demanding work well) -- instead, she alleges that she was not comparably treated because of her gender.

We are unable to discern an "inhospitable environment" exception to Title VII's mandate that employers may not discriminate based on

20

employees' gender as to the "terms, conditions, or privileges of employment." See, e.g., Dothard v. Rawlinson, 433 U.S. 321, 334-35 (1977) (Title VII's bar to gender-based discrimination with respect to female applicant for "contact" prison guard job in a maximum-security male prison was not surmounted merely by "peculiarly inhospitable [environment] for human beings of whatever sex" subject to regular "violence and disorganization"); Williams, 187 F.3d at 564 ("women working in the [male-dominated] trades do not deserve less protection from the law than women working in a courthouse"), cf. Smith v. Sheahan, 189 F.3d 529, 534 (7th Cir. 1999) (dismissing the idea that a prevailing workplace culture can excuse discriminatory actions, as "[t]here is no assumption-of-risk defense to charges of work place discrimination") (citing Oncale , 523 U.S. at 81-82). The objective prong of the Harris test instead requires the jury to assess the events in the context of the workplace, as is appropriate.

Additionally, SBI simply does not assert that Department 710's physical environment permits different treatment of its employees based on their gender. See United States v. Gregory, 818 F.2d 1114, 1117-18 (4th Cir. 1987) (citation omitted) (employer has burden to prove that gender-based distinction is "reasonably necessary to the normal operation of that particular business"); see also Dothard, 433 U.S. at 334 (Title VII's bona fide occupational qualification exception is "extremely narrow").

Whether Ms. Conner experienced unlawful discrimination -- even in SBI's "rough" environment -- must be determined based on "the simple test of whether the evidence shows `treatment of a person in a manner which but for that person's sex would be different.'" City of Los Angeles Dep't of Water and Power v. Manhart , 435 U.S. 702, 711 (1978). The jury must therefore evaluate the employer's treatment of Ms. Conner in light of the work environment at the Altavista plant, which was, as the district court found, "an unpleasant place to work" where none of the employees were treated "tenderly." J.A. 1103. Cf. Reeves, slip op. at 16 (reasonable jury could find unlawful discrimination even where supervisor also harassed other employees). The factual development concerning SBI's work atmosphere was therefore entirely appropriate and necessary, and was properly admitted into evidence at trial by the district court. See Fed. R. Evid. 403. It was, arguably, the most probative and relevant evidence with

21

respect to Ms. Conner's claim, and we are simply unpersuaded by the district court's post-verdict view in this regard.

2.

Further, the district court found it "not surprising that Shaeffer [sic] sought verification" of Ms. Conner's uterine hemorrhaging condition by insisting that she display her bloodied pants to him rather than to a nurse, in light of her poor attendance record. J.A. 1097. After the jury returned its verdict against SBI, the district court also expressed "serious concerns about the impact of the testimony relating to the bloody pants incidents," based on its view that Ms. Conner's counsel "chose to repeatedly elicit details" about this "irrelevant and prejudicial evidence." J.A. 1103-04. However, we again disagree, conclude that this evidence was highly relevant and probative, and find the district court's post-verdict ruling to be erroneous.

First, the court admitted evidence of the uterine hemorrhaging and SBI's conduct relating to it, and thus had assessed its probative value during the jury trial. See infra § III.D. During trial, the district court properly determined that this evidence's probative value was not substantially outweighed by a danger of unfair prejudice. See Fed. R. Evid. 403. Because the evidence had been properly admitted and was before the jury, counsel's argument in reliance on it was also entirely proper.[17]

Second, the record simply fails to support the district court's impression of any overemphasis of this evidence-- of approximately 1000 pages of transcript, Ms. Conner's testimony on the subject is barely thirty lines. Likewise, Ms. Haskins's corroborating testimony is fewer than fifteen lines. And, of thirty-seven pages of counsel's closing argument, fewer than twenty-three lines refer to the subject. Under these circumstances, we must conclude that there was no unfair

_____

[17] If there had been some basis to restrict the use of this evidence -- and none is evident -- the court was empowered to give limiting instructions to prevent the jury from drawing improper inferences from it. The district court gave no such limiting instructions, consistent with its determination that the evidence was relevant and admissible.

22

prejudice to SBI resulting from references to this highly relevant evidence relating to the bloody pants.

D.

In addition, the district court committed two distinct errors of law by failing to apply the Harris test to determine whether the unwelcome conduct was "severe or pervasive," and by failing to properly assess the evidence in its totality. Application of the Harris test to this evidentiary record, viewed in the totality of the circumstances, leads us to conclude that sufficient evidence exists for the trier of fact to find an actionable hostile work environment in the Altavista plant. We review the Harris factors in turn:

1. Frequency of the Unwelcome Conduct

We find ample evidence before the jury to support a conclusion of both frequent and unwelcome conduct. More specifically, the evidence established:

> (a) Ms. Conner was required to mop the entire floor several times each week, while her supervisors led her co-workers in ridiculing, belittling, and mocking her. See supra § II.B.4. Unlike the male machine operators, she was not allowed time to clean the heavy layer of machine oil off of herself before her breaks began. See supra § II.B.9. She was followed and timed with a stopwatch during her breaks for approximately six weeks. Id.

> (b) On a regular basis, her work assignments were not comparable to those of the male operators, as demonstrated by the contrast between the number of hours Ms. Conner spent on the advanced tasks of unplanned tool setting and machine set-up, as compared to the male operators. See supra § II.B.3.

> (c) When the men learned the advanced tool setting and machine set-up skills, they were promoted to a higher

23

pay grade, unlike Ms. Conner. <u>See supra</u>§ II.B.8. SBI's failure to pay Ms. Conner comparably affected her daily from November 1993 until her termination in May 1995, and was particularly egregious because: (i) she was one of the most capable employees in the Department (according to Boyd and Schaefer); and (ii) she even came to the plant on her non-work days to perform advanced tasks for men who were incapable of performing them and were themselves paid at the higher rate. <u>Id.</u>

(d) Schaefer repeatedly and inappropriately asked Ms. Conner if she was "on the rag." <u>See supra</u> § II.B.5.

(e) Schaefer repeatedly and inappropriately asked Ms. Conner if she "got any last night." <u>See supra</u> § II.B.5.

(f) Approximately ten different times, Ms. Conner was not permitted to leave the factory floor until, each time, she showed her supervisor the blood from her uterine hemorrhaging. <u>See supra</u> § II.B.6.

The frequency and regularity of the unwelcome conduct established by the evidence here is similar to that underlying our decision in <u>Amirmokri v. Baltimore Gas and Elec. Co.</u>, 60 F.3d 1126 (4th Cir. 1995). In <u>Amirmokri</u>, a supervisor and co-workers referred to the plaintiff by derogatory nicknames almost daily, just as Schaefer often used gender-based taunts to ridicule Ms. Conner. <u>See Amirmokri</u>, 60 F.3d at 1131. Like the plaintiff in <u>Amirmokri</u>, Ms. Conner experienced frequent humiliation because she was given work assignments that were more difficult than those of her co-workers. <u>Id.</u> The regularity of the unwelcome conduct here is entirely different from the few, scattered remarks that we determined were merely"offensive" in <u>Hartsell v. Duplex Products, Inc.</u>, 123 F.3d 766 (4th Cir. 1997) (noting four instances of others' gender-based derogatory office commentary). Further, unlike the plaintiff in <u>Hartsell</u>, who herself uttered numerous vulgarities in the workplace, Ms. Conner was the regular target of the unwelcome conduct rather than a willing participant in such conduct. <u>See Hartsell</u>, 123 F.3d at 773. There was therefore

24

ample evidence before the jury establishing that Ms. Conner experienced frequent and unwelcome gender-based hostile conduct.

2. <u>Severity of the Unwelcome Conduct</u>

The second <u>Harris</u> factor, the severity of the unwelcome conduct, taken as a whole, is also firmly established on this evidentiary record. For example:

> (a) Ms. Conner was denied the necessary training to perform her job. <u>See supra</u> § II.B.1. She was thereafter inequitably assigned to perform more difficult tasks. <u>See supra</u> § II.B.3; <u>see also Amirmokri</u>, 60 F.3d at 1131 (supervisor tried to embarrass plaintiff by giving him impossible tasks and by stating in front of his co-workers that plaintiff did not know what he was doing). She nonetheless performed skilled tasks, sometimes assisting men who did not have those necessary skills, and she did so at a lower rate of pay. <u>See supra</u> § II.B.8. Also, she was selectively disciplined for her absences. <u>See supra</u> § II.B.2. When she sought remedy for these disparities, her concerns were repeatedly ignored by the responsible authorities. <u>See supra</u> § II.B.7; <u>see also</u>, <u>e.g.</u>, <u>Kimzey v. Wal-Mart Stores, Inc.</u>, 107 F.3d 568, 573 (8th Cir. 1997) (managers' failure to respond to complaints added to hostile environment).

> (b) Ms. Conner was required to expose her uterine blood to Mr. Schaefer, and to do so within view of her co-workers. <u>See supra</u> § II.B.6. This unnecessary and deeply invasive mandate is certainly "severe" by any definition. <u>See</u>, <u>e.g.</u>, <u>Forts v. Ward</u>, 621 F.2d 1210, 1214 n.5 (2d Cir. 1980) (noting that privacy justified the district court's order that prevented male prison guards from viewing female inmates during the early morning, when "one may find her night clothes and bedding visibly soiled from an unexpected menstrual flow [which she] wish[ed] to clean up"), <u>cited with</u>

25

approval in Lee v. Downs, 641 F.2d 1117, 1119-20 (4th Cir. 1981).

(c) Schaefer publicly asked Ms. Conner if she was "on the rag," and in this manner, he dismissed the legitimacy of her frustrations by personal gender-based remarks. See supra § II.B.5. His remarks are unlike the generalized and plaintiff-invited references to gender stereotypes in Hartsell. See Hartsell, 123 F.3d at 772 (office comments that females would "cry like a baby," and suggestions that women be a "mini van driving mommy," or "like a good wife" were not severe in a context where the plaintiff herself referenced masturbation and used profanity to refer to her supervisor). Schaefer's references to Ms. Conner's menstruation amplified the severity of his requirement that Ms. Conner actually expose her gynecological blood to him.

(d) Schaefer publicly asked her "didn't she get any last night?," another personalized offensive utterance. See supra § II.B.5; see also, e.g. , Spicer, 66 F.3d at 707 (abusive environment established by two days of a few co-workers' remarks such as "This is nipple check day," and "Which one is bigger?").

(e) The regular mocking of Ms. Conner while she mopped the floor is also of consequence for our view of the totality of the circumstances. See supra§ II.B.4; see also Amirmokri, 60 F.3d at 1131 (supervisor and co-workers abused Iranian plaintiff almost daily by calling him a "camel jockey," "the local terrorist," and "the Emir of Waldorf").

The more serious incidents enumerated here were complemented by numerous additional occurrences that, in isolation, may have seemed less problematic, but which actually served to exacerbate the severity of the situation. Reviewed and considered cumulatively, the unwelcome conduct here was clearly of sufficient severity to support the jury's verdict against SBI.

26

3. <u>Nature of the Unwelcome Conduct</u>

We next turn to the third <u>Harris</u> factor: whether the evidence demonstrates unwelcome conduct that was physically threatening or humiliating, or that instead merely constituted offensive utterances. Some examples of such unwelcome conduct found in the evidentiary record are the following:

(a) Ms. Conner, one of the higher-performing machine operators at the plant, was paid less than male machine operators who did not possess equivalent skills, and who sought her assistance on their machines. <u>See supra</u> § II.B.8. This difference in compensation, unrelated to her job performance, was humiliating and offensive.

(b) Ms. Conner experienced a single powerful incident of gender-based intimidation, when in her meeting with Giudice, he slammed his clenched fist on his desk and screamed that he would fire her on the spot if she ever mentioned sexual discrimination again. <u>See supra</u> § II.B.10; <u>see also Smith</u>, 202 F.3d at 242 (discriminatory intimidation, as well as ridicule and insult, can contribute to an alteration of the conditions of the victim's employment to create an abusive working environment).

(c) Schaefer's questions of "Are you on the rag?" and "Didn't you get any last night?" constitute, in context and by their frequency, personally humiliating public ridicule. <u>See supra</u> § II.B.5. Such gender-based ridicule was amplified by Schaefer's leadership in mocking Ms. Conner while she complied with his orders that she perform the stereotypically female task of mopping, which men in the same job class were not required to perform. <u>See supra</u> § II.B.4.

(d) In order to obtain permission to leave the work floor in response to a medical and safety need, Ms. Conner repeatedly had to display her gynecological bleeding to Schaefer, who also frequently and quite publicly

27

humiliated her by asking, "Are you on the rag?" See supra §§ II.B.5, II.B.6. While the district court reasoned that "[t]here was no evidence that Schaefer made the plaintiff show her blood-stained pants for any reason other than to verify the presence of a medical problem," this suggestion is logically flawed. First, because Schaefer flatly denied Ms. Conner's version of these incidents, there is no affirmative evidence of any medical purpose underlying his disavowed conduct. Second, Schaefer's visual inspection could not provide any verification of a medical problem, because blood on a woman's pants can also indicate normal body functions.[18] Cf. Dorland's Medical Dictionary 1013 (28th ed. 1994) (menstruation is a normal discharge of blood from the uterus). A senseless mandate from a supervisor that an employee expose symptoms of a deeply private reproductive system dysfunction is simply humiliating, especially when, as here, that mandated display must occur within eyesight of other employees.

We conclude that the unwelcome conduct established by this record was sufficiently humiliating and physically threatening to support the jury's verdict.

4. Unreasonable Interference with Work Performance

The fourth Harris factor requires us to determine whether the evidence shows that the frequent and unwelcome conduct unreasonably interfered with Ms. Conner's work performance.

Under the evidence, SBI failed to provide the usual training to Ms.

_____

[18] The district court indicated that "[g]iven Conner's poor attendance record, it is not surprising that Shaeffer [sic] sought verification of this condition." We are unpersuaded by this argument, in light of Schaefer's blanket denial of having engaged in the conduct, and in light of the undisputed evidence that SBI's medical verification policy required employees to provide a note from a health care professional. There simply was no evidence suggesting that SBI physically inspected its employees to verify their asserted medical needs.

28

Conner, see supra § II.B.1, by not initially assigning her to Department 767 with the new male machine operators, and also by denying her ad hoc lessons and practice on a day-to-day basis throughout her employment. These omissions undermined her ability to perform despite her excellent aptitude for the tasks. As a result, Ms. Conner alone bore the responsibility for acquiring the necessary job skills, unlike her counterparts, the male machine operators.

Ms. Conner's specific job assignments (unlike those of her male counterparts), see supra §§ II.B.3, II.B.4, also interfered with her performance -- she operated physically separated machines; those machines produced dissimilar parts, which slowed her operation time by precluding a rapid transfer of knowledge between machines. She was often reassigned to tool setting and set-ups rather than permitted to operate her machines as they were producing parts. She also regularly had to mop the entire floor during the time that the men were able to produce parts.

We therefore conclude that there was sufficient evidence for the jury to find that the disparate and adverse treatment of Ms. Conner in Department 710 unreasonably interfered with her work performance, due to her gender, during the course of her SBI employment.

5. Psychological Harm

We must also consider, pursuant to Harris, whether there was evidence, from the plaintiff's subjective perception of the hostile work environment, i.e., that psychological harm resulted therefrom.

On this record, Ms. Conner experienced regular, profound humiliation because of her gender, unlike the male machine operators. The disparate duties assigned to her, and the failure to provide her with needed training prior to the task assignments, placed her in a significantly higher-stress workplace than experienced by the male machine operators. She suffered pain from the blistered hands that resulted from her efforts to force the hexagonal bars into the machines, because her supervisors failed to show her how to properly load the bars.

29

Ms. Conner suffered daily headaches and nausea from the humiliation, and as a result, a doctor prescribed medication for her. The workplace disparities caused her to have constant fear that she would lose her job, adding even more stress. When she met with the plant manager, Mr. Giudice, to inform him of these disparities, he screamed at her and threatened to terminate her "on the spot," causing her to immediately start crying. She cried throughout the rest of that meeting. J.A. 155.

We find sufficient evidence before the jury to support Ms. Conner's subjective perception of Department 710 as a hostile and abusive environment towards women. The evidence supports the jury's finding that this environment resulted in psychological harm to her.

6. Summary

Applying the Harris factors to this record, viewed in the totality of the circumstances, there is ample support for the jury finding of severe or pervasive conduct sufficient to constitute a hostile work environment. Indeed, in our view, the conduct evidenced here is extreme. Our conclusion is buttressed by the legal principle that whether the harassment was sufficiently severe or pervasive to create a hostile work environment is "quintessentially a question of fact" for the jury, Smith, 202 F.3d at 243 (citing Beardsley v. Webb, 30 F.3d 524, 530 (4th Cir. 1994)), as is the issue of the plaintiff's credibility. The fact that two female machine operators later hired into the Department, Ms. Rorer and Ms. Haskins, experienced the same types of unwelcome conduct is also highly supportive of the jury's determination of a gender-based hostile work environment. See Harris v. L & L Wings, Inc., 132 F.3d 978, 981 (4th Cir. 1997) (identical course of harassment experienced by two female employees indicated it was not an isolated phenomenon); Stahl v. Sun Microsystems, Inc., 19 F.3d 533, 538 (10th Cir. 1994) (because critical inquiry in hostile environment claim is the environment, sexual harassment incidents directed at other employees can prove plaintiff's claim).

We accordingly conclude that there is sufficient evidence in this record to support the jury's finding of a hostile work environment.[19]

_____

[19] SBI raises three additional arguments, as follows:

First, SBI contends that the harassment claim impermissibly exceeds

IV.

We review for abuse of discretion the district court's grant of a conditional new trial. See Atlas Food Sys. and Serv., Inc. v. Crane Nat'l Vendors, Inc., 99 F.3d 587, 594 (4th Cir. 1996). A new trial is warranted when (1) the verdict is against the clear weight of the evidence; (2) the verdict is based upon evidence which is false; or (3) the verdict will result in a miscarriage of justice. Id. In considering a new trial motion, the district court may weigh the evidence and consider the credibility of the witnesses. Wyatt v. Interstate & Ocean Transport Co., 623 F.2d 888, 891 (4th Cir. 1980).

A.

As explained previously, the district court erred when it failed to apply the appropriate legal standard to evaluate whether the evidence was sufficient to establish existence of a hostile work environment.

_____

the scope of Ms. Conner's EEOC charge that alleged that she was "harassed and subjected to different terms and conditions of employment . . . and in general was treated differently than the males." J.A. 1014. We find that her claims in her judicial complaint are reasonably related to her EEOC charge. See Smith, 202 F.3d at 246 (citation omitted).

Second, SBI asserts that Ms. Conner's sexual harassment claim is limited to the 180-day period preceding her EEOC claim because incidents outside the statutory window are time-barred unless they can be related to a continuing violation. SBI contends that no continuing violation occurred. We agree with the district court's rejection of this argument, as the continuing conduct was plainly evidenced during the relevant period.

Third, SBI maintains that Ms. Conner failed to file her charge with the appropriate state agency. Ms. Conner moved to supplement the record on appeal with a copy of the EEOC's letter transmitting Ms. Conner's charge to the Virginia Council on Human Rights ("VCHR") pursuant to the agencies' worksharing agreement. We grant the motion and conclude that Ms. Conner properly filed her charge with the VCHR. See Puryear v. County of Roanoke, 214 F.3d 514, 522 (4th Cir. 2000); see also J.A. 278-79 (evidence of charge filed with EEOC and its issuance of right-to-sue letter).

See supra § III.A. And a material legal error by definition constitutes an abuse of discretion. See Koon v. United States, 518 U.S. 81, 100 (1996). We therefore must reverse the district court's grant of the conditional new trial. Cf. Weisgram, 120 S. Ct. at 1015 (if court of appeals concludes that the loser on appeal has had full and fair opportunity to present the case, including arguments for a new trial, appellate court may appropriately instruct district court to enter judgment).

B.

Further, the district court based its grant of a conditional new trial on its weighing of the evidence, concluding that the verdict was a product of the jury's "passion, whim, and emotion." The court viewed Ms. Conner's testimony about the frequency of Mr. Schaefer's comments and about the meeting with Mr. Giudice as not credible, incorrectly determined that irrelevant and prejudicial evidence affected the jury's verdict, see supra § III.C., and found that the damages award was too large. See J.A. 1100-07.

1.

Our review of the record convinces us that the extensive corroborating evidence, and the reasonable inferences to be drawn from it, support Ms. Conner's testimony on the two minor points that the district court apparently disbelieved. See Abasiekong v. City of Shelby, 744 F.2d 1055, 1059 (4th Cir. 1984) (trial judge should not substitute his own judgment of facts and witness credibility, particularly where the subject matter of the trial is easily comprehended by a lay jury).[20]

_____

[20] We are also unpersuaded by the district court's reasons for discounting two points in Ms. Conner's testimony. First, as to Ms. Conner's trial testimony on the frequency that Schaefer remarked,"Didn't you get any last night?" or "Are you on the rag?," she testified that Schaefer made these remarks approximately ten to twenty times per month. This testimony is not necessarily inconsistent with her deposition testimony, which SBI was permitted to fully utilize for impeachment purposes.

Second, the district court apparently disbelieved Ms. Conner's testimony about her meeting with Giudice. Giudice and Keller testified that sexual harassment was not mentioned in the meeting. The district court

In any event, minor inconsistencies cannot justify such an intrusion into the jury's purview. This jury verdict was simply not against the clear weight of the evidence; a jury could reasonably find, under the totality of circumstances, that Ms. Conner was subjected to an abusive work environment based on gender. See Abasiekong , 744 F.2d at 1059; cf. Boczar v. Manatee Hosp. & Health Sys., Inc., 993 F.2d 1514, 1519 (11th Cir. 1993) (reversing conditional new trial grant and remanding for reinstatement of the verdict in light of simple issue presented that was sharply disputed, and evidence permitted reasonable jury inference supporting plaintiff's claim).

2.

As we have already determined, the district court's view that the jury heard irrelevant or unfairly prejudicial evidence is incorrect under Harris. See supra § III.C. Accordingly, the court abused its discretion in ruling that the evidence was irrelevant and unfairly prejudicial.[21] See, e.g., Lloyd v. Georgia Gulf Corp., 961 F.2d 1190,1197

_____

found Giudice and Keller more credible because they"testified in conformity with a contemporaneously drafted memorandum." The court also viewed as "almost impossible to believe" Ms. Conner's testimony about the meeting, based on Ms. Haskins' "very credible" testimony that four days later, Giudice initiated a meeting with her to ascertain that she did not feel sexually harassed. The district court did not view as probative that Ms. Haskins saw Ms. Conner leave her meeting with Giudice in tears. However, the jury evidently accepted another reasonable interpretation: (1) the memorandum -- allegedly contemporaneous, but which was not shown to Ms. Conner until after litigation began -- was constructed in anticipation of possible litigation; (2) Giudice's unusual meeting with Ms. Haskins (Ms. Conner's co-worker) four days after his meeting with Ms. Conner, appears to have been in reaction to Ms. Conner's discrimination claim to him; and (3) Ms. Conner left her meeting with Giudice in tears because he threatened her with termination if she mentioned sexual discrimination again. Intrusion into the jury's province -- the determination of credibility -- is simply not warranted on this evidence. Cf. Reeves, slip op. at 18 (reinstating jury verdict of workplace discrimination that was sufficiently supported by the evidence, rather than reconsidering new trial motion after reversing grant of summary judgment).

[21] That the jury carefully considered the evidence before it, and based its award thereon, is further indicated by the jury's award of less dam-

33

(5th Cir. 1992) (district court abused its discretion by granting conditional new trial based on prejudice from evidence that was relevant, admitted, and only briefly referenced by counsel); Douglass v. Eaton Corp., 956 F.2d 1339, 1344 (6th Cir. 1992) (district court abused its discretion by concluding evidence of workplace disparities was irrelevant, based on the court's interpretation of the employer's differential treatment of employees), abrogated on other grounds by Weisgram, 120 S. Ct. at 1019.

3.

Whether the jury's award was excessive is a question of law, which we review de novo. See Gasperini v. Center for Humanities, Inc., 518 U.S. 415, 435-36 & n.18 (1996). We find that a compensatory damages award of $20,000 is entirely reasonable -- and not excessive -- for discrimination that the jury reasonably could find that Ms. Conner experienced. Cf. Kimzey, 107 F.3d at 570 ($35,000 compensatory damages for sexual harassment); Hearn v. General Elec. Co., 927 F. Supp. 1486, 1500-01 (M.D. Ala. 1996) ($50,000 and $20,000 in compensatory damages for plaintiffs' mental anguish from suffering gender discrimination); Reinhold v. Commonwealth of Va., No. 96CV82, 1996 WL 1061854, at *1 (E.D. Va. Oct. 31, 1996) (jury verdict summary) ($85,000 compensatory damages for sexual harassment), vacated and remanded in light of new Supreme Court decisions, 151 F.3d 172 (4th Cir. 1998).

4.

A punitive damages award is appropriate where the employer "engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the [plaintiff's] federally protected rights." 42 U.S.C. § 1981a(b)(1). The standard required to qual-

---

ages than requested on Ms. Conner's Equal Pay Act claim. The jury's award corresponded to her claimed lost wages limited to the statutory period for allowable recovery under Title VII. Although the Equal Pay Act actually permits a longer recovery period than does Title VII, the jury's damages award demonstrates its thoughtful and rational deliberation of the matters with which it was charged.

34

ify for a punitive damages award, the "reprehensible character of the conduct[,] is not generally considered apart from the requisite state of mind," and employers need not "engage in conduct with some independent, `egregious' quality before being subject to a punitive award." Kolstad v. American Dental Assoc., 119 S. Ct. 2118, 2124, 2126 (1999).**22** Under this Kolstad standard, the evidence presented here was sufficient to support the jury's award of punitive damages. However, the amount of the award was by law excessive and we must remand for factual development. See 42 U.S.C. § 1981a(c) (Title VII plaintiff's total compensatory and punitive damages award may not exceed $300,000).**23**

V.

For the foregoing reasons, we reverse the district court's award of judgment as a matter of law to SBI, and we also reverse its award to SBI of a conditional new trial. We remand this case to the district court for the jury's verdict to be reinstated, and for such further proceedings as may be warranted.

REVERSED AND REMANDED

_____

**22** The district court's opinion relied on a standard that was subsequently vacated by the Supreme Court's Kolstad decision.
**23** The parties disagree as to the applicable damages maximum under 42 U.S.C. § 1981a. The issue relating to determination of this damages maximum has not yet been addressed by the district court.

35